The GILBERT & BENNETT MANUFAC-
TURING COMPANY, Plaintiff,

v.

WESTINGHOUSE ELECTRIC
CORPORATION, Defendant.

Civ. A. No. 75–2070–J.

United States District Court,
Massachusetts.

Sept. 30, 1977.

Warren G. Miller, Boston, Mass., for plaintiff.

John R. Hally, Nutter, McClennen & Fish, Boston, Mass., for defendant.

## OPINION

JULIAN, Senior District Judge.

This case arises out of the sale of an electrostatic precipitator (trade name Precipitron), a pollution control device, by the defendant, Westinghouse Electric Corporation (Westinghouse), to the plaintiff, Gilbert & Bennett Manufacturing Company (G & B Co.). Plaintiff, G & B Co., is a Connecticut corporation having its principal place of business in Georgetown, Connecticut, and another plant in Blue Island, Illinois. Defendant, Westinghouse, is a Pennsylvania corporation having a usual place of business in Boston, Massachusetts. Plaintiff seeks to recover damages in the amount of $100,000 for breach of express and implied warranties assertedly arising out of the sales contract. This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332.

At a pre-trial conference held on March 18, 1977, the Court, with the assent of both parties, ordered separate trials on the issues of liability and damages pursuant to Rule 42(b) of the Federal Rules of Civil Procedure. The issue of liability was tried by the Court sitting without a jury on April 25 through April 28, 1977. After considering the evidence, the pleadings, a pre-trial stipulation of facts and the pre-trial and post-trial briefs filed by counsel, the Court arrives at the following findings of fact and conclusions of law.

For many years prior to 1971, G & B Co.'s plant in Blue Island, Illinois, had been manufacturing metal fencing and fence posts. These fence posts were then shipped to the Coatings Engineering Corporation (CEC) plant in Massachusetts, which is a wholly owned subsidiary of G & B Co., where they were coated with a form of plastic, known as plastisol. In mid-1971, G & B Co. install-

ed a plastisol coating operation at its Blue Island, Illinois, plant, under the supervision of James Knott, a college graduate who had majored in economics and had taken mechanical engineering courses. He had also been president and treasurer of CEC since its inception in 1956. The coating operation consisted of an overhead conveyor belt upon which the uncoated fence posts were suspended. The fence posts were first sprayed with plastisol, then conveyed into an oven heated at between 400 and 450 degrees Fahrenheit, and then passed through a cooling chamber where the coating hardened and formed a durable "skin" on the fence post. Plastisol is composed primarily of vinyl resin, plasticizers and color pigment. The mixture is not patented, and Knott testified that he has developed and worked with thousands of formulas of plastisol.

When the plastisol-coated fence posts were in the oven, some of the compounds found in the plastisol were driven off into the surrounding air by the extreme heat. The fumes thus emitted consisted of smoke and noxious odors.

Knott was familiar with the pollution problems caused by uncontrolled plastisol emissions; approximately one year earlier a thermal oxidizer [1] had been installed at the CEC plant in Massachusetts, on Knott's recommendation, in order to allay neighborhood complaints about smoke and offensive odors emanating from the plant. Nevertheless, the plastisol coating line in Blue Island, Illinois, began operating at full capacity in September 1971 without the installation of any pollution control devices. On September 10, 1971, an employee from the Cook County Air Pollution Control Bureau visited G & B Co.'s Blue Island plant and informed the personnel there that a neighbor had complained about the smoke and odors coming from the plant.

As a result of this complaint Knott telephoned Westinghouse at its Sturtevant Division in Hyde Park, Massachusetts, in September 1971 to inquire about purchasing a Precipitron for G & B Co.'s coating opera-

tion. Knott had never seen a Precipitron, but he was familiar with the general principles by which it functioned. Knott was not aware of any plastisol coating plant which was using the Precipitron as a pollution control device. Knott spoke to Charles Perry, a salesman-engineer employed by Westinghouse. Perry does not possess a college degree and has no formal engineering training. He has sold Precipitrons since 1945, and estimated that by 1971 he had sold approximately 1,000 Precipitrons, including the larger PV series (which is the model involved in this litigation) and the smaller PO series. Most of his customers used the Precipitron to control oil mist in manufacturing plants. He had never sold a Precipitron to a customer who was interested in controlling plastisol fumes.

The Court finds that during this telephone conversation Knott informed Perry that G & B Co. was using plastisol to coat metal fence posts and that there was a pollution problem. He told Perry the volume and temperature of the polluted air. Knott did not tell Perry, and Perry did not inquire about, the velocity of the polluted air, the density of the plastisol contaminants in the air, or the chemical composition of plastisol emissions. Perry told Knott that he knew very little about plastisol fumes (although he recognized the phrase), and advised Knott to talk to a man named Harrison at the Dewey & Almy plant in Cambridge, Massachusetts, who would be able to inform Knott about the Precipitron's effectiveness in controlling plastisol emissions. Knott did not get in touch with Harrison until after G & B Co. had purchased the Precipitron. The evidence is conflicting regarding whether Perry said that there were 26 plastisol coating plants owned by Dewey & Almy Corporation which were using Precipitrons to control plastisol emissions, or whether Perry said that one of Dewey & Almy's 26 installations was using a Precipitron. The Court need not resolve this question.

1. A thermal oxidizer is another type of pollution control device which is much more expensive to buy, install and operate than a Precipitron.

On September 23, 1971, Perry followed up the telephone conversation by mailing to CEC, attention of Mr. Knott, at the CEC plant in Massachusetts, a quotation form (Exh. 1), three advertising brochures (Exhs. 2, 3 and 4), and a covering letter. Exhibit 1 (covering letter and quotation form) and Exhibits 2, 3 and 4 were received and read by Knott. The quotation form quoted prices for the PV–45 Precipitron having a maximum capacity of 6,660 cubic feet per minute of polluted air, and for the PV–46 unit having a maximum capacity of 8,000 cubic feet per minute of polluted air. The maximum capacities of the PV–45 and the PV–46 units bracketed the anticipated volume of air at G & B Co.'s Blue Island plant, which was 6,800 cubic feet per minute. One brochure (Exh. 2) stated that the Precipitron unit, when correctly sized to handle a specified quantity of air, should have an efficiency of 90% if the air did not exceed a specified velocity.[2] Another advertising brochure (Exh. 3) states that the Precipitron is not designed to handle certain pollutants, including those which "dry out, oxidize readily, or form gums."[3] The Court finds that the three advertising brochures (Exhs. 2, 3 and 4) state clearly that the primary function of the Precipitron was the elimination of oil mist in industrial plants. Knott testified that he had read the three brochures.

The quotation form, a one-page document with printing on both sides, contained the Westinghouse disclaimer of warranty and limitation of liability clauses, which will be discussed later. On the reverse side of the quotation form (Exh. 1) appears the following statement:

"Quotations . . . are subject to acceptance within 30 days from date of quotation."

The purchase price for the PV–46 was quoted at $3,150. Perry's covering letter, which is stapled to the quotation form, mentions that the quotations were for a Precipitron "to handle plastisol fumes."

Further negotiations, including Exhibit 5, led to a reduction in the purchase price of the Precipitron PV–46 unit from $3,150 to $2,850. On November 4, 1971, G & B Co. in Blue Island, Illinois, mailed a purchase order (Exh. 6) to Westinghouse's Boston office, attention of Mr. Perry, which states:

"Please enter our order for the following:

| "1 PV–46 Precipitron | $2,850.00 |
| to handle Plastisol fumes | F.O.B. |
| Rated at 8000 CFM | Hyde Park, Mass. |

"NOTE: RUSH DELIVERY
NOT TO EXCEED 6 WEEKS."

On November 10, 1971, Westinghouse mailed to G & B Co. in Blue Island, Illinois, an "Acknowledgment of Order" (Exh. 7). It was received by plaintiff on November 12, 1971. It is a one-page document with typewritten and printed matter on the front side and printed matter on the reverse side. The disclaimer of warranties clause appears on the front side in conspicuous type, and on the reverse side appears the limitation of liability clause. These clauses were also printed in the same type on Westinghouse's quotation (Exh. 1). The clauses on the front side read as follows:

"This order is accepted under our conditions as set forth below, and on the reverse side of this acknowledgment.

2. The brochure (Exh. 2) reads in pertinent part: "Air Flow Requirements. The PRECIPITRON unit is sized to clean a specified quantity of air (cfm) with an effective efficiency of 90%. To obtain this efficiency, the cfm through the frame should not exceed the rated cfm. Overall cleaning efficiency also depends a great deal on uniform air flow throughout the frame. The air velocity through any part of the frame should therefore not exceed the rated velocity of 333 f.p.m. by more than 10%."

3. The brochure (Exh. 3) reads in pertinent part: "Some conditions and materials must be avoided as being unsuited for control by precipitron methods. . . . Highly volatile materials, while not necessarily hazardous, may leave residues which are insoluble, or which may combine with the moisture normally present in the air to form corrosive compounds. Animal and some vegetable oils, air drying oils, paints, inks and others that dry out, oxidize readily, or form gums, will coat the working elements too effectively and too quickly for practical operation. *With due respect to these limitations*, the application of Precipitron oil mist control still offers tremendous possibilities for the improvement of nuisance conditions *within its field of application*." (Emphasis added.)

"WARRANTY

Westinghouse warrants that the products sold by it will, when delivered, or when installed, if this contract provides for installation by Westinghouse, be free of defects in workmanship or material. Should any failure to conform to this warranty become apparent during a period of one (1) year after date of installation, and not more than two (2) years after date of delivery, Westinghouse shall, upon prompt, written notice and compliance by the customer with such instructions as it shall give with respect to the return of defective products or parts, correct such non-conformity by repair or replacement, F.O.B. factory, of the defective part or parts. Correction in the manner provided above shall constitute a fulfillment of all liabilities of Westinghouse with respect to the quality of the products. THE FOREGOING WARRANTY IS EXCLUSIVE AND IN LIEU OF ALL OTHER WARRANTIES OF QUALITY, WHETHER WRITTEN, ORAL OR IMPLIED (INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR PURPOSE)."

On the reverse side, in smaller, lighter print, appears the following:

"THE CONDITIONS STATED BELOW SHALL TAKE PRECEDENCE OVER ANY OTHER CONDITIONS, AND NO CONTRARY, ADDITIONAL OR DIFFERENT PROVISIONS OR CONDITIONS SHALL BE BINDING ON WESTINGHOUSE UNLESS ACCEPTED BY WESTINGHOUSE IN WRITING.

. . . . .

"LIMITATION OF LIABILITY

Neither party shall be liable for special, indirect, incidental or consequential damages. The remedies of the Purchaser set forth herein are exclusive, and the liability of Westinghouse with respect to any contract or sale or anything done in connection therewith, whether in contract, in tort, under any warranty, or otherwise, shall not, except as expressly provided herein, exceed the price of the product or part on which such liability is based."

It has been stipulated that the plaintiff paid the entire purchase price for the Precipitron PV–46 unit, which amounted to $2,964, including tax. The Precipitron PV–46 unit was started up on February 9, 1972, and shortly thereafter Westinghouse learned that plaintiff was dissatisfied with it. The start-up report (Exh. 11), dated February 11, 1972, written by a Westinghouse employee who serviced the start-up, states:

"The customer was not happy with the 50% smoke that was removed. They thought more smoke was to be removed."

The Court finds, on the basis of Knott's testimony and the testimony of plaintiff's expert, Lawrence Steenberg, who performed scientific tests on G & B Co.'s Precipitron in July 1972, that the Precipitron was removing only about 10% of the particulate matter emitted during the curing process and thereby allowing about 90% to escape into the air outside the plant. There was also evidence adduced at trial that the Precipitron was ineffective in controlling the noxious or offensive odors coming from G & B Co.'s plant. In the face of the testimony by plaintiff's own expert that the Precipitron is not designed to remove odors, plaintiff's counsel in open court on April 25, 1977, waived any claim that the Precipitron was in breach of a warranty to remove odors except insofar as the odors may be caused by particulate matter, that is, minute particles of solid or liquid substances as distinguished from gaseous substances. The Court finds that the Precipitron was not designed or intended to eliminate noxious or offensive odors produced by gases. Accordingly, there is no need for a separate analysis of the Precipitron's ineffectiveness in controlling odors produced by gases and its inefficiency in controlling particulate emissions.

The Court finds that the Precipitron's inefficiency in controlling particulate emissions was not due to any defect in workmanship or material. On the contrary, the evidence clearly shows, and the Court finds, that the Precipitron PV–46 was not de-

signed or intended to control the large quantity of plastisol effluent which was being sent through G & B Co.'s Precipitron in Blue Island, Illinois. The start-up report (Exh. 11) states that:

> "Precipitron voltages were adjusted as listed on nameplate and *the cell and ionizer were checked and found correct.*" (Emphasis added.)

Knott testified that in May 1972 G & B Co. performed its own test on the ionizer voltages and these results showed that the voltages were correct and operating at maximum capacity. While Knott repeatedly informed Perry and other Westinghouse employees of his disappointment with the Precipitron, he never expressed or intimated, either at the time the events were occurring, or at the trial, that there was any defect with the Precipitron. Frank Consentino, a Westinghouse engineer, who was detailed to G & B Co.'s plant in June 1972, attributed the Precipitron's inefficiency to the nature of plastisol [4] and to the quantity of plastisol exhausts.[5]

G & B Co., with the assistance of Westinghouse personnel, made numerous efforts to increase the efficiency of the Precipitron. These efforts included widening the duct channel leading into the Precipitron so as to reduce the velocity [6] of the contaminated air, spraying cold water downstream of the Precipitron so as to dilute the density of the plastisol emissions, utilizing a second set of cell plates and ionizers so that while the first set was being cleaned, the second set could be inserted into the Precipitron, and raising the ionizer voltage as high as possible without shorting the collector cells. A Westinghouse employee suggested that a second Precipitron be installed in series with the first, but he later rejected his own suggestion and thus G & B Co. never implemented it.

In the summer of 1972 Knott and some Westinghouse employees toured a plastisol-coating operation at the plant of the American Flange Co. in Linden, New Jersey, which was successfully using Precipitrons to control plastisol emissions. There is no evidence regarding the size of the Precipitron units located at the American Flange installation. There is evidence, however, that even when the Precipitron was turned off, there was less smoke produced at the American Flange plant than at G & B Co.'s Blue Island plant. The Court finds that the fact that Precipitrons of unknown size effectively controlled a smaller quantity of plastisol emissions than those emitted from G & B Co.'s plant does not show that the plaintiff's Precipitron PV–46 was defective.

In June 1972 criminal proceedings were instituted against the plaintiff in the Circuit Court of Cook County, Illinois, for violation of the Illinois air pollution laws, Ill. Rev.Stat. c. 111½, § 1009 (Exh. 50). The criminal complaint focused upon the noxious or offensive odors emanating from plaintiff's Blue Island plant.[7] The criminal proceedings were abandoned and on January 8, 1973, the state brought a civil action against plaintiff in the Circuit Court of Cook County, Illinois, seeking fines and an

---

4. In his report (Exh. 33) Consentino stated: "[T]he material collected [on the cellplates of the Precipitron] was not free flowing and it appears that this would tend to reduce our ionization."

5. In his report (Exh. 33) Consentino stated: "The cellplates were totally coated indicating that there just was not enough capacity to handle this volume for any length of time."

6. The Court finds that before the duct work was performed, the contaminated air being sent through the Precipitron was not of uniform speed and that the velocities ranged from 150 to 200 up to 600 feet per minute (Exh. 26), which far exceeds the preferred maximum rate of 333 feet per minute. It is unclear to what degree the widening of the duct channels served to reduce or standardize the velocity of contaminated air. However, plaintiff's expert, Lawrence Steenberg, testified that on July 17, 1972, the velocity of air reaching the Precipitron was 270 feet per minute.

7. The complaint reads in pertinent part: "Gilbert and Bennet [sic] Manufacturing Co. has . . . allowed the emission into the atmosphere of Contaminants so as to cause or tend to cause Air Pollution in Illinois to wit; . . . said emission having a noxious or offensive odor and being detrimental to Health, Safety or well being of the People of the State of Illinois." (Exh. 50.)

injunction for its violation of Ill.Rev.Stat. c. 111½, § 1009(a). The plaintiff was fined $8,900 and was enjoined from operating its plastisol coating line from April 2, 1973, until June 21, 1973. The imposition of the fine was upheld by the Appellate Court of Illinois, First District, Fifth Division, on December 13, 1974 (Exh. 52). In September 1973 the plaintiff purchased a thermal oxidizer at a cost of approximately $21,552.60. The thermal oxidizer is the same type of pollution abatement device that Knott had purchased for the CEC plant sometime in 1970 and it had satisfactorily controlled CEC's plastisol emissions. The thermal oxidizer at G & B Co.'s plant also performed satisfactorily. On February 28, 1975, plaintiff's attorney sent a letter to Westinghouse Electric Corporation, attention of Mr. Perry, notifying the defendant that the Precipitron sold to G & B Co. was in breach of warranties.[8] This civil action was commenced on May 27, 1975.

Plaintiff's theory of liability is that the defendant breached express warranties and implied warranties of merchantability and fitness for a particular purpose. Defendant's principal defense is that the sales contract expressly excluded any warranties except that the Precipitron would be free of defects in workmanship or material, and that Westinghouse would repair or replace any defective parts of the Precipitron for a period of up to one year after installation and two years after delivery. Defendant asserts that this warranty was not broken. Defendant also contends that even if there were express or implied warranties, these warranties also were not broken.

■ The initial choice of law question is resolved by a pretrial oral stipulation by the parties that Massachusetts law was to be applied to the making of the contract.[9] At the conclusion of the trial on the issue of liability, the plaintiff moved to be relieved of this stipulation, contending that at the

time of entering into it he was unaware of a seminal case in the Circuit (*Roto-Lith, Ltd. v. F. P. Bartlett & Co.*, 297 F.2d 497 (1 Cir. 1962)). The defendant, however, prepared and presented its case upon the assumption that Massachusetts substantive law applied. Furthermore, the Court rules that no "manifest injustice" (*Central Distributors, Inc. v. M. E. T. Inc.*, 403 F.2d 943, 945 (5 Cir. 1968); *United States v. Rexach*, 482 F.2d 10, 27 (1 Cir.), *cert. denied*, 414 U.S. 1039, 94 S.Ct. 540, 38 L.Ed.2d 330 (1973)) would result to the plaintiff by holding it to its pretrial stipulation, because under the "appropriate relation" choice of law test adopted by the Uniform Commercial Code (Mass.Gen.Laws c. 106, § 1–105), Massachusetts substantive law would govern the terms of this contract, even absent any stipulation. See *Skinner v. Tober Foreign Motors, Inc.*, 345 Mass. 429, 187 N.E.2d 669 (1963). Accordingly, the plaintiff's motion to be relieved of its stipulation is denied, and the formation of the contract will be determined according to Massachusetts law.

■ The next question is what documents and conduct of the parties constitute the contract in this case. The defendant contends that its September 23, 1971 quotation (Exh. 1) could constitute an offer to sell and that the plaintiff could be found to have accepted the offer by its purchase order (Exh. 6). Even though the Uniform Commercial Code may have expanded the definition of "contract" and makes contracts easier to form (Mass.Gen.Laws c. 106, § 1–201(11); J. White, R. Summers, Uniform Commercial Code (1973) at 22), nevertheless the Court concludes that the parties did not contemplate an agreement by the exchange of Exhibits 1 and 6. Because the term "offer" is not defined in the Code, the common law definition remains relevant.

---

**8.** The letter states in pertinent part: "*The device never operated in accordance with your warranties and representations and never was able to eliminate the air pollution it was designed to correct.*" (Emphasis in the original.) (Exh. 49.)

**9.** The parties, however, did not stipulate which law was to govern the performance of the contract.

An offer [10] is made when the offeror leads the offeree to reasonably believe that an offer has been made. *Timmins v. F. N. Joslin Co.*, 303 Mass. 540, 22 N.E.2d 76 (1939); *Kuzmeskus v. Pickup Motor Co., Inc.*, 330 Mass. 490, 115 N.E.2d 461 (1953). In this case, G & B Co. could not have reasonably believed that the Westinghouse quotation (Exh. 1) was intended to be an offer. The quotation form was mailed to and received by CEC in Massachusetts, not by the plaintiff, G & B Co., in Blue Island, Illinois. It quoted prices for two different Precipitrons, not one, and the quoted price for the PV–46 was $3,150 rather than the final purchase price of $2,850. In short, the Westinghouse quotation was not an offer of sale of two Precipitrons, but rather an offer to enter into negotiations for the sale of one Precipitron. See *Cannavino & Shea, Inc. v. Water Works Supply Corp.*, 361 Mass. 363, 280 N.E.2d 147, 149 (1972).

Furthermore, the quotation (Exh. 1) expired by its own terms 30 days after its date of issuance, which was September 23, 1971. The purchase order (Exh. 6) was dated November 4, 1971, which was 12 days after the quotation had expired. Thus, even if the quotation form could be construed as the "offer," there was no timely acceptance of such offer.

The plaintiff contends that its purchase order (Exh. 6) constitutes the "offer" which was accepted by the defendant in its acknowledgment of order (Exh. 7). The Court agrees that plaintiff's purchase order is the operative "offer". It was an offer to buy and it states all the necessary terms of the sale, including the subject matter of the proposed sale, namely, Precipitron PV–46, the number of units sold (one), the purchase price ($2,850) and place of delivery (F.O.B. Hyde Park, Massachusetts). However, since the acknowledgment of order (Exh. 7) states additional terms not contained in the purchase order, namely, the disclaimer of warranties and limitation of liability claus-

es, the question arises whether the acknowledgment constitutes an acceptance of plaintiff's offer or a counteroffer. Resolution of this question is found in the Uniform Commercial Code, Mass.Gen.Laws c. 106, § 2–207, as construed by the Court of Appeals for this Circuit in *Roto-Lith, Ltd., supra.*

Mass.Gen.Laws c. 106, § 2–207, provides in pertinent part:

"*Additional Terms in Acceptance or Confirmation.*

"(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

"(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

"(a) the offer expressly limits acceptance to the terms of the offer;

"(b) they materially alter it; or

"(c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

"(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this chapter."

The disclaimer of warranties and the limitation of liability clauses appearing on

10. The Restatement (Second) of Contracts § 24 (Tent. Draft Nos. 1–7, 1973) defines the term "offer" as follows: "An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it."

Westinghouse's acknowledgment constitute a "material alteration" to the original offer (Comments 3 and 4 to Mass.Gen.Laws c. 106, § 2–207), the terms of which are solely to the disadvantage of the offeror, G & B Co. In *Roto-Lith Ltd. v. F. P. Bartlett & Co.*, 297 F.2d 497 (1 Cir. 1962), the First Circuit held that where a response materially alters the terms of the offer solely to the disadvantage of the offeror, then the response constitutes not an acceptance, but a counteroffer expressly conditioned on the offeror's assent to the additional terms. The facts in *Roto-Lith* are on all fours with the facts in the case at bar. In each case the parties had very limited contact with each other prior to the exchange of the operative documents. In each case the plaintiff purchaser sent a purchase order which was silent on warranties. In each case the plaintiff gave defendant no notice of objection to the defendant's disclaimer of warranty clause. In *Roto-Lith* the buyer received and paid for the goods and by such conduct was held to have accepted the seller's counteroffer with all its terms, including the warranty disclaimer. Likewise, G & B Co., by paying for and accepting delivery of the Precipitron PV–46 without notifying the seller of its objection [11] to the additional terms, accepted the counteroffer proposed in the Westinghouse acknowledgment and became bound by all its terms, including the warranty disclaimer clause.

■■ The next question is whether the warranty disclaimer clause satisfies the requirements set forth in Mass.Gen.Laws c. 106, § 2–316. Mass.Gen.Laws c. 106, § 2–316, requires express warranties [12] to be construed in a manner consistent with language purporting to negate or limit warranties. To the extent that such construction is unreasonable, the negation or limitation of warranty must fail and the express warranty be given effect. The plaintiff contends that the disclaimer of warranties clause must fail because it is inconsistent with Westinghouse's express warranty that the Precipitron sold to the plaintiff would "handle plastisol fumes." This phrase first appears in Perry's September 23, 1971 letter accompanying the quotation form, and reappears in plaintiff's purchase order. The Court finds that Westinghouse did not warrant to the plaintiff that the Precipitron PV–46 would solve plaintiff's air pollution problems at the Blue Island plant. When read with a view to producing a reasonable result in the business context in which the parties acted (*Republic Pipe & Supply Corp. v. Marnell Const. Corp.*, 1977 Mass.App.Ct. Adv.Sh. 812, 363 N.E.2d 1361 (1977); *Whiting Corp. v. Process Engineering, Inc.*, 273 F.2d 742, 744 (1 Cir. 1960)), the phrase "to handle plastisol fumes" could only be a reference to the use to which plaintiff intended to put the Precipitron. G & B Co. could not have reasonably construed the phrase "to handle" as a warranty that the Precipitron would effectively eliminate G & B Co.'s plastisol emission problem, when G & B Co. knew that the Precipitron was not designed to function on certain highly viscuous materials, or on high velocities of air, and it also knew that the Westinghouse

**11.** G & B Co. had ample time to notify Westinghouse of any objection it may have had to the additional terms. Plaintiff received defendant's acceptance (Exh. 7) on November 12, 1971 (stamped on reverse side of Exh. 7). It stated: "We . . . expect to ship approximately week of 12–17–71." Plaintiff received the Precipitron on January 13, 1972. Thus two months and nine days elapsed from the receipt of acceptance to the receipt of the goods sold.

**12.** Mass.Gen.Laws c. 106, § 2–313, defines an express warranty as follows:

"§ 2–313. *Express Warranties by Affirmation, Promise, Description, Sample.* (1) Express warranties by the seller are created as follows:

"(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

"(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

"(c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the sample or model."

salesman (Perry) was not told the chemical composition of plastisol or what substances, including gases, it would produce when subjected to extreme heat, or the velocity of contaminated air produced by G & B Co.'s Blue Island plant. While plaintiff may have hoped that the Precipitron would solve its problems, defendant did not so warrant.

■ The Court further finds that Westinghouse's disclaimer of implied warranties of merchantability and fitness for a particular use do meet the requirements set forth in Mass.Gen.Laws c. 106, § 2–316(2). Mass. Gen.Laws c. 106, § 2–316(2) provides as follows:

"(2) Subject to subsection (3), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous."

The disclaimer clause in Westinghouse's acknowledgment of order (Exh. 7) was "conspicuous" within the meaning of Mass.Gen. Laws c. 106, § 1–201(10): (1) the disclaimer is on the front side of the acknowledgment; (2) the type is large and readable; (3) the disclaimer is simple, direct, and easily understood; (4) the disclaimer is typed in capital letters; (5) the word "merchantability" is specifically mentioned; and (6) the "person" against whom the disclaimer is to operate is a sophisticated entity. See *Avenell v. Westinghouse Electric Corp.*, 41 Ohio App.2d 150, 70 Ohio Op.2d 316, 324 N.E.2d 583 (1974).

■ Thus the Court rules that the contract between the parties excludes all implied warranties and that no express warranty was made other than the limited one that the Precipitron would be free of all defects in workmanship and material and that any defective parts would be repaired or replaced by Westinghouse for a period of up to one year after installation and two years after delivery. The defendant did not breach this limited warranty.

This Court is aware that the construction of Uniform Commercial Code § 2–207 made in *Roto-Lith* "has not been treated kindly by the cases or the commentaries." *Ebasco Services v. Pa. Power & Light Co.*, 402 F.Supp. 421, 437 (E.D.Pa.1975); 76 Harv.L. Rev. 1481, 1484 (1963). In the event that the First Circuit overrules [13] *Roto-Lith*, this Court will determine whether the Precipitron PV–46 sold by Westinghouse to G & B Co. was in breach of either an implied warranty of merchantability [14] or of fitness for a particular use.[15]

■ G & B Co.'s frequent complaints about the Precipitron, which first became known to defendant as early as February 11, 1972 (service report, Exh. 11) (two days after the machine was started up), consti-

---

**13.** A district court in this Circuit is bound by a prior ruling in point by the Court of Appeals, until that case is overruled. *Old Colony Trust Co. v. United States*, 300 F.Supp. 1032, 1035 (D.Mass.), aff'd, 423 F.2d 601 (1 Cir. 1969).

**14.** Mass.Gen.Laws c. 106, § 2–314, defines an implied warranty of merchantability as follows:
"§ 2–314. *Implied Warranty: Merchantability; Usage of Trade.*

"(2) Goods to be merchantable must at least be such as
"(a) pass without objection in the trade under the contract description; and
"(b) in the case of fungible goods, are of fair average quality within the description; and
"(c) are fit for the ordinary purposes for which such goods are used; and
"(d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and
"(e) are adequately contained, packaged, and labeled as the agreement may require; and
"(f) conform to the promises or affirmations of fact made on the container or label if any."

**15.** Mass.Gen.Laws c. 106, § 2–315, defines an implied warranty of fitness for a particular purpose as follows:
"§ 2–315. *Implied Warranty; Fitness for Particular Purpose.* Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose."

**548**

tutes timely and sufficient "notice of breach" to satisfy the requirements of Mass.Gen.Laws, c. 106, § 2–607. *Matsushita Electric Corp. of America v. Sonus Corp.,* 362 Mass. 246, 262, 284 N.E.2d 880, 889 (1972). This Court finds that the Precipitron sold by the defendant to the plaintiff was "of merchantable quality" within the meaning of Mass.Gen.Laws c. 106, § 2–314. "Merchantable quality" means that the goods shall be reasonably suitable for ordinary uses for which goods of that kind and description are sold. *Vincent v. Nicholas E. Tsiknas Co.,* 337 Mass. 726, 151 N.E.2d 263 (1958). The Precipitron is ordinarily used "for normal air cleaning or for oil mist control applications" (Westinghouse advertising brochure, Exh. 2, page 3). The fact that the Precipitron PV–46 was not designed to control the large quantity of plastisol particulate matter and odors emanating from G & B Co.'s Blue Island plant does not mean that the Precipitron was not merchantable.

The Court further finds that there was no implied warranty that the Precipitron would be fit for a particular purpose. Perry explicitly told Knott in the September 1971 telephone conversation that he knew little about plastisol and that Knott should get in touch with a Mr. Harrison, who would know more about the Precipitron's effectiveness in controlling plastisol emissions. In short, Perry disclaimed any special knowledge or skill in the area of the Precipitron's application to plastisol emission. Therefore, Westinghouse had no "reason to know .... [that G & B Co. was] . . . relying on the seller's skill or judgment to select or furnish suitable goods." Mass.Gen.Laws, c. 106, § 2–315.

In accordance with this opinion, it is ordered that the complaint be dismissed and judgment be entered for the defendant.