Whitehead, J.
Plaintiff S&F Concrete Contractors, Inc. (“S&F”) filed suit against defendants Strickland Systems, Inc., International Form Corporation (collectively “IFC”),[1] and Dole J. Kelley, Jr., Consulting Structural Engineer, in connection with the collapse of a concrete bay that occurred during a concrete pour at the construction site of Digital Equipment Corporation’s manufacturing facility in Hudson, Mas *618 sachusetts (the “Digital project”). S&F alleges that the collapse was due to the failure of one or more of the twenty-two (22) steel columns IFC specially built to support the forming system during the concrete pour. IFC and S&F have filed cross-motions for summary judgment pursuant to Mass.R.Civ.P. 56(c).
BACKGROUND
Marshall Contractors was the general contractor on the Digital project. S&F is a concrete subcontractor. In June, 1992, S&F was awarded a subcontract for foundation work at the Digital project. In October, 1992, S&F was awarded a subcontract for slab and flooring work on certain buildings at the Digital project.
IFC designs, fabricates, and furnishes concrete forming systems. After a series of late summer and early fall meetings and negotiations between Peter Moskos (“Moskos”), an S&F Project Manager, and Jerry Koslowski (“Koslowski”), a Vice President at IFC, S&F agreed to lease the IFC concrete forming system known as the Flex-A-Form System, for use on the Digital project. Moskos and Koslowski had had prior dealings with each other in connection with S&Fs agreement to use the Flex-A-Form System on another project (the Deer Island project) in which it was involved. At the time of the negotiations regarding the Digitál project, S&F had not yet used the Flex-A-Form System on the Deer Island project.
In August, 1992, S&F sent drawings to IFC for the latter’s use in preparing a proposal for S&F’s rental of the Flex-A-Form System in connection with the Digital Project. On September 15, 1992, IFC issued its first proposal to S&F, which contemplated the rental of thirty thousand (30,000) square feet of forms. The second page of the September 15 proposal contained a paragraph which provided: “The terms on the reverse side of the Flex-A-Form contract, receipt of which is hereby acknowledged by signed acceptance below, shall apply except as noted above (copy enclosed).” S&F received the September 15, 1992 proposal, along with IFC’s General Terms And Conditions, which were not printed on the back side of the contract, but were enclosed on a separate sheet of paper. Paragraph 11 of the General Terms And Conditions provided:
Customer agrees to hold IFC harmless for any or all damages to property or persons while said equipment is in transit or while said equipment is in customer’s possession, including all expenses, damages, claims, suits and actions including costs and attorneys fees incurred directly or indirectly, out of or in connection with the leasing, maintenance or use of the material of IFC. Customer further agrees to carry insurance to cover such damages.
S&F did not sign IFC’s September 15 proposal.[2]
On October 29, 1992, after further negotiations, IFC issued a revised proposal to S&F for the rental of thirty thousand (30,000) square feet of forms. This proposal was identical in form to the prior proposal. S&F did not sign the October 29, 1992 proposal.
Subsequently, on November 23, 1992, IFC issued a third proposal, also identical in form to the prior proposals, for the rental of twenty thousand (20,000) square feet of forms.[3] S&F did not sign the November 23 proposal as drafted. Instead, Moskos altered the payment terms and dates on page two of the proposal, and attached that page to a S&F Purchase Order, No. 3500, for the rental of twenty thousand (20,000) square feet of forms.[4] Moskos signed Purchase Order No. 3500, and expressly acknowledged that it was issued in response to IFC’s November 23, 1992 proposal via the following notation: “per Int Form letter dated 11-23-92 (copy attached).”[5]
It soon became apparent that the Flex-A-Form System could not be utilized at the Digital project without post-shoring to support the system during the concrete pour. IFC designed and fabricated special columns for that purpose and S&F agreed to lease the columns.
On November 25, 1992, S&F issued a second Purchase Order, No. 3781, also signed by Moskos, for twenty-two (22) steel columns for use with the Flex-A-Form System. Moskos did not reference IFC’s November 23, 1992 proposal, or any other proposal, on Purchase Order No. 3781.
The IFC forming equipment was delivered to S&F in several shipments. Each shipment was accompanied by a Delivery Report, which contained the phrase ‘Terms and Conditions” in the top right hand corner. Each Delivery Report contained a list of “Conditions Governing Rental” on the front page. The next to last paragraph of the “Conditions Governing Rental” provided: “You agree to hold harmless this company for any or all damages to property or persons while said equipment is being used under this delivery order.” S&F accepted delivery of, and used the IFC forming equipment it had rented. S&F did not object to the Conditions Governing Rental.
On January 6, 1993, IFC submitted another proposal to S&F for the rental of ten thousand (10,000) square feet of forms. The January 6 proposal was identical in form to the prior three proposals. On January 11, 1993, Moskos issued Purchase Order No. 3786, for ten thousand (10,000) square feet of forms. Moskos expressly incorporated IFC’s January 6, 1993 proposal into the Purchase Order.
Meanwhile, on January 7, 1993, one of the concrete bays at the Digital project collapsed during a concrete pour. Approximately nineteen (19) people were injured. This suit followed.
DISCUSSION
I. Summary Judgment Standard
Summary judgment shall be granted where there are no genuine issues as to any material fact and *619 where the moving party is entitled to judgment as a matter of law. Cassessov. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, “and [further] that the moving party is entitled to judgment as a matter of law.” Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989).
A party moving for summary judgment who does not have the burden of proof at trial may demonstrate the absence of a triable issue either by submitting affirmative evidence that negates an essential element of the opponent’s case or “by demonstrating that proof of that element is unlikely to be forthcoming at trial.” Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991). Accord Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). “If the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts which would establish the existence of a genuine issue of material fact in order to defeat [the] motion.” Pederson, supra at 17. “[T]he opposing party cannot rest on his or her pleadings and mere assertions of disputed facts to defeat the motion for summary judgment.” LaLonde v. Eissner, 405 Mass. 207, 209 (1989). Where both parties have moved for summary judgment and “in essence there is no real dispute as to the salient facts or if only a question of law is involved,” summary judgment shall be granted to the party entitled to judgment as a matter of law. Dawes, supra at 553.
II. The Claims
■ A. IFC’s Motion For Summary Judgment
IFC’s primary argument in support of its Motion for Summary Judgment is that S&F is bound by an indemnification provision in IFC’s General Terms and Conditions. It contends that those terms and conditions were attached to each IFC proposal, and therefore became part of the parties’ lease agreement when S&F issued Purchase Order No. 3500, expressly incorporating IFC’s November 23, 1992 proposal.[6] IFC also alleges that the parties’ course of conduct confirms their intention that S&F agree to hold IFC harmless for any and all damages incurred during the rental of its equipment in connection with the Digital project. In support, IFC cites Moskos’ deposition, in which he testified that he and Koslowski verbally agreed that the general terms and conditions applicable to the Deer Island project would also apply to the Digital project. Moskos Dep., Vol. 1, pp. 57-58, 111-13, 129-30. IFC also finds support in the post-accident dealings between it and S&F, specifically, S&F’s January 11, 1993 purchase order, No. 3786, wherein S&F once again expressly incorporated the corresponding IFC proposal.
In opposition, S&F first alleges that the substantive terms of the parties’ agreement are in dispute. It states that contrary to IFC’s claim, the lease agreement was not limited to a simple exchange of a bid proposal and purchase order, but also included brochures, shop drawings, and related design sketches prepared by IFC. S&F also alleges that IFC has focused on the wrong purchase order. As mentioned above, S&F alleges that the collapse was caused by the failure of one or more of the steel columns. It is S&F’s contention that the purchase order for the steel columns, No. 3781, was a separate contract, and therefore not governed by the General Terms and Conditions incorporated into Purchase Order No. 3500.
S&F also disputes that the parties’ course of conduct demonstrates any agreement by S&F to indemnify IFC, particularly since the system used on the Digital project required substantial modification. S&F alleges that “[a]t a minimum, the fact that purchase orders and bid proposals were issued at diverse times, containing substantially different terms, gives rise to genuine issues of disputed fact.” Plaintiffs Opposition to Motion for Summary Judgment, at 15.
In addition, S&F has presented several minor claims, to which it has ascribed less importance than those articulated above. S&F alleges that the indemnification clause is voidable as a result of fraudulent misrepresentations made by IFC, that IFC is estopped from pursuing an indemnification claim, and that the scope of the indemnification provision is in dispute.
In response, IFC alleges that even assuming that Purchase Order No. 3781 was a separate contract, S&F must nevertheless indemnify IFC pursuant to the indemnification clause on the Delivery Reports which accompanied each shipment of goods. IFC claims that this indemnification clause became part of the parties’ agreement when S&F accepted the goods without objection. See G.L.c. 106, §2-207; Roto-Lith. Ltd. v. F.P. Bartlett & Co., 297 F.2d 497 (1st Cir. 1962). IFC also alleges that S&F’s proffered dispute regarding the substance of their agreement is immaterial, for even if true, the additional documents will have no effect on the indemnification issue. Finally, IFC contends that S&F has not established a prima facie case of misrepresentation, fraudulent inducement, or equitable estoppel, and that S&F’s alleged dispute as to the scope of the hold harmless clause is insufficient to overcome summary judgment.
S&F alleges that IFC’s reliance on §2-207 and Roto-Lith is misplaced, as their lease agreement is not a “sale of goods,” and therefore not governed by §2-207.
B. S&F’s Cross Motion For Summary Judgment
S&F’s Cross Motion for Summary Judgment is predicated upon its belief that the primary indemnification clause at issue, ¶11 of IFC’s General Terms and Conditions, requires S&F to indemnify IFC for IFC’s *620 own negligence, and is therefore rendered void by G.L.c. 149, §29C.
IFC disputes the applicability of §29C. It alleges that the parties’ agreement was not “for or in connection with a contract for construction” within the meaning of §29C, and therefore falls outside of the statute. IFC also claims that the indemnification clause at issue is not facially invalid under §29C, and that the policy reasons behind the enactment of §29C indicate that it should not be applied as between subcontractors and material suppliers.
III. G.L.c. 149, §29C
The first issue with which the Court must deal is whether the indemnification provision in ¶11 of IFC’s General Terms and Conditions, is rendered void by G.L.c. 149, §29C.[7] See Harnois v. Quannapowiit Development, Inc., 35 Mass.App.Ct. 286, 288 (1993). In that regard, the initial question to be answered is whether the contract between IFC and S&F falls within the scope of the statute. A contract will fall outside of G.L.c. 149, §29C, where, for example, the contract is not “for or in connection with a contract for construction.”
In this case, the parties dispute whether their contract was “for or in connection with a contract for construction,” and hence, whether it was governed by §29C. The resolution of this dispute lies in an interpretation of the .-statute. When interpreting a statute, the Court must seek to effectuate “the intent of the Legislature, as evidenced by the language used, and considering the purposes and remedies intended to be advanced.” Saccone v. State Ethics Commission, 395 Mass. 326, 328 (1985).
After consideration of the issue, the Court believes that the S&F/IFC contract was not “for or in connection with a contract for construction” within the meaning of the statute. There can be no dispute that the S&F/IFC contract was not a contract for construction. IFC agreed to provide the Flex-A-Form system and related technical services, it did not agree to perform any actual construction work.'
S&F’s reliance on IFC brochures is misplaced. None of the material relied upon contemplates that IFC would perform any construction work. The related design and technical services do not bring the S&F/IFC contract within the ambit of a construction contract.
The more difficult question is whether the S&F/IFC contract was “in connection with a contract for construction” within the meaning of the statute. In short, it was not.
The indemnity provision at issue was limited to the contract between S&F and IFC; there was no connection between it and the construction contracts between S&F and Marshall, or Marshall and Digital Equipment Corporation. Implicit in the phrase “in connection with a contract for construction” is the requirement that there be an existing construction contract between the would-be indemnitor and indemnitee. In this case, there was none.
S&F’s proposed interpretation of §29C is an unduly broad one, the logical result of which would be to expand the reach of §29C to any contract between a subcontractor and merchant (in this case a lessor) for equipment that may be used in a construction project. Considering the purposes behind the enactment of §29C (to level the playing field between general contractors and subcontractors), it is highly unlikely that the General Court intended such a result. Because G.L.c. 149, §29C is inapplicable to the indemnification provision at issue, S&F’s Cross Motion for Summary Judgment must be denied.[8]
Although S&F is not entitled to summary judgment on its claim that the indemnification provision is void, it does not follow that IFC is entitled to summary judgment on its claim that it is entitled to indemnification. There exists a factual dispute concerning whether Purchase Order No. 3781, which contained no indemnification provision, was a separate offer to contract for the rental of equipment from IFC, or whether it was part of the contract that governed Purchase Order No. 3500, and was therefore subject to the same terms and conditions, including the indemnification provision. The resolution of this issue turns on the parties’ intentions, and must be resolved at trial. Flesner v. Technical Corruminications Corp., 410 Mass. 805, 809 (1991).
IV. G.L.c. 106, §2-207[9]
The Court has considered IFC’s alternative argument, namely, that even if Purchase Order No. 3781 was a separate contract, S&F is bound by the indemnification clause on the delivery tickets via G.L.c. 106, §2-207(2) (Article 2 of the Uniform Commercial Code— Sales). The Court, however, concludes that the parties’ lease agreement falls outside of G.L.c. 106, §2-207 (the “Battle of the Forms”).
IFC’s argument — that Article 2 applies to “transactions in goods,” and that a lease is a transaction and therefore governed by Article 2, is overly simplistic. “Goods” are defined as: “all things . . . which are movable at the time of identification to the contract for sale . . .” G.L.c. 106, §2-105(1). (Emphasis added.) “Moreover, many of the individual provisions of Article 2 contain terms such as ‘seller,’ ‘buyer,’ ‘sale,’ and ‘contract for sale.’ These terms are patently inapplicable to lease transactions. Therefore, even if Article 2 may be held generally applicable to leases under the ‘transaction’ rationale, the specific provisions of Article 2 containing more restrictive terms cannot . . . Courts utilizing this approach seem to be grabbing at straws to support their application of Article 2 to lease transactions.” Cucchiv. Rollins Protective Services, 546 A.2d 1131, 1140 (Pa.Super. 1988), reversed on other grounds, 574 A.2d 565 (Pa. 1990).
*621 While Massachusetts has extended the warranty provisions of Article 2 to leases, see Back v. Wickes Corp., 375 Mass. 633, 639 (1978); Mason v. General Motors Corp., 397 Mass. 183, 187-89 (1986), the Supreme Judicial Court has perceived that extension to be sanctioned by the General Court. IFC has proffered no grounds for similarly extending §2-207, and absent clear guidance by either the Appellate courts or the General Court, this court declines to do so. Neither Russo v. Joseph A. Sedlack Management Consultants, 1988 WL159944 (D.Mass.), nor Patriot General Life Ins. Co. v. CFC Investment Co., 11 Mass.App.Ct. 857 (1981), require a contrary conclusion.
Additionally, even if Article 2 were to be extended to cover leases in general, the Court is not persuaded that the indemnification clause contained in IFC’s delivery tickets would automatically become part of the agreement. While it is true that as between merchants, additional terms contained in an acceptance become part of the contract, if such terms materially alter the contract, they do not constitute additions to it unless the other party expressly assents to those terms. See G.L.c. 106, §2-207(2)(b) and Uniform Commercial Code Comments 3 and 4. The indemnification clause at issue effects a substantial shift in liability, and constitutes a material alteration of the contract which would require S&F’s express agreement. Id.
IFC relies on Roto-Lith, supra, and its progeny[10] for the proposition that once S&F accepted delivery of the columns with knowledge of, and without objection to, the indemnification clause contained in the Delivery Tickets, S&F became bound by that clause. However, after consideration of the myriad of cases interpreting §2-207, and criticizing Roto-Lith,[11] the Court is persuaded that Roto-Lithis in fact an incorrect application of §2-207.[12]
The primary criticism of Roto-Lith is that it permits an acceptance of an offer to be made expressly conditional on the offeror’s assent to additional terms, by implication from the fact that the acceptance materially alters the terms of the offer. See Roto-Lith, supra at 500. Section 2-207, however, plainly provides that a definite and seasonable expression of acceptance is just that, an acceptance, even if it contains additional or different terms, “unless acceptance is expressly made conditional on assent to the additional or different terms." G.L.c. 106, §2-207. (Emphasis added.) Moreover, under Roto-Lith, no contract is formed by shipment of the goods,[13] and without the express assent, no contract is created pursuant to §2-201(1). Leonard Pevar Co. v. Evans Products Co., 524 F.Supp. 546, 552 (D.Del. 1981). “Nevertheless, the parties, conduct may create a contract pursuant to §2-107(3).” Id.[14]
In Dorton v. Collins &Aikman Corporation, 453 F.2d 1161 (6th Cir. 1972), the Court interpreted §2-207 in a manner much more in tune with the language of the statute. “(T]he Dorton approách is to recognize a contract unless the would-be acceptance specifically makes its operation conditional on the offeror’s assent to its terms.” EBASCO Services Inc. v. Pennsylvania Power & L. Co., 402 F.Supp. 421, 438 (E.D.Pa. 1975) (emphasis in original). In short, this Court agrees that the Dorton decision reflects a better reasoned approach to §2-207. See id.
Turning to the facts of the instant case, there remains the issue of whether the IFC Delivery Reports contained language indicating that the acceptance was expressly conditional on assent to the indemnification clause.[15] The Delivery Reports contain the phrase “TERMS AND CONDITIONS” in the upper right-hand corner. They also contain the phrase “CONDITIONS GOVERNING RENTAL” above the actual conditions. Finally, the Delivery Reports contain the following sentence above the signature line: “RECEIVED AND ACCEPTED THE ABOVE IN GOOD ORDER AND SUBJECT TO THE CONDITIONS GOVERNING RENTAL AGREEMENT.’’[16]
The Dorton court rejected similar, and arguably more stringent language as expressing a conditional acceptance. In doing so, the court noted that in order to fall within the §2-207(1) proviso “it is not enough that an acceptance is expressly conditional on additional or different terms; rather, an acceptance must be expressly conditional on the offeror’s assent to those terms.” Dorton, supra at 1168. The court further stated:
Viewing the Subsection (1) proviso within the context of the rest of that Subsection and within the policies of Section 2-207 itself, we believe that it was intended to apply only to an acceptance which clearly reveals that the offeree is unwilling to proceed with the transaction unless he is assured of the offeror’s assent to the additional or different terms therein ... That the acceptance is predicated on the offer’s assent must be ‘directly and distinctly stated or expressed rather than implied or left to inference.’ Webster's Third International Dictionary (defining ‘express’). Id.
The language in IFC’s Delivery Reports does not indicate IFC’s unwillingness to proceed unless S&F agreed to the indemnification clause. Moreover, said language does not even indicate that the acceptance was expressly conditional on additional terms. The Court must therefore conclude that the language contained in IFC’s Delivery Reports was insufficient to make the acceptance expressly conditional on S&F’s assent to the indemnification provision. To hold that IFC’s acceptances were expressly conditional would ignore the express language of §2-201(1). Id. “Such an interpretation is not justified in view of the fact that Subsection 2-207(1) is clearly designed to give legal recognition to many contracts where the variance between the offer and acceptance would have precluded such recognition at common law." Id.
*622 ORDER
For the foregoing reasons, it is hereby ORDERED that the Motion for Summary Judgment of defendant International Form Corporation be DENIED. It is further ORDERED that the Cross Motion for Summary Judgment of plaintiff S&F Concrete Contractors, Inc., be DENIED.

international Form Corporation is the successor-in-interest to Strickland Systems, Inc.

The September 15 proposal contained the same terms and conditions, including the hold harmless clause, as an August 24, 1992 proposal IFC had submitted in connection with the Deer Island project. Moskos had not signed the August 24 proposal as drafted, but altered the pricing and quantity provisions on that proposal. Moskos had also limited the hold harmless clause of the General Terms and Conditions to exclude indemnification while the forming equipment was in transit. On September 16, 1992, Moskos issued a Purchase Order that incorporated the revised proposal. S&F began using IFC’s forms on the Deer Island project in late September/early October, 1992.

The first page of the November 23 proposal was mistakenly dated October 29, 1992.

Although Purchase Order No. 3500 is dated November 4, 1992, the actual date of that order was November 23, 1992. The discrepancy in dates is due to the fact that Moskos began to fill out the purchase order on November 4, 1992, but did not issue it until November 23, after S&F had determined the precise amount of forms it needed.

The attachment to Purchase Order No. 3500 did not contain an indemnity provision. As noted above, IFC’s General Terms and Conditions were not printed on the back of its proposals, but were included on a separate sheet of paper.

Moskos has averred that he is not sure whether IFC’s General Terms and Conditions were attached to the November 23, 1992 proposal. Indeed, he has testified that it is equally possible that he did not receive a copy of the Terms and Conditions with the November 23, proposal. Moskos has not, however, unequivocally averred that the General Terms and Conditions were not attached to the proposal at issue. In any event, there is no dispute that the General Terms and Conditions were attached to the initial September 15, 1992, proposal, and that Moskos was familiar with those terms and conditions.

General Laws, c. 149, §29C provides:
Any provision for or in connection with a contract for construction, reconstruction, installation, alteration, remodeling, repair, demolition or maintenance work, including without limitation, excavation, backfilling or grading, on any building or structure, whether underground or above ground, or on any real property, including without limitation any road, bridge, tunnel, sewer, water or other utility line, which requires a subcontractor to indemnify any party for injury to persons or damage to property not caused by the subcontractor or its employees, agents or subcontractors, shall be void. (Emphasis added.)

In light of this ruling, the Court need not address the question of whether the statute is limited to general contractor/subcontractor relationships, or also applies to supplier/subcontractor relationships, or whether either of the two indemnification provisions at issue, as written, are rendered void by §29C. See Harnois, supra at 288.

“This section of the UCC has been described as a ‘murky bit of prose[.]’ ” Dorton v. Collins & Aikman Corporation, 453 F.2d 1161, 1165 (6th Cir. 1972), quoting Southwest Engineering Co. v. Martin Tractor Co., 205 Kan. 684, 694 (1970).

See, e.g., Teradyne, Inc. v. Mostek Corp., 797 F.2d 43, 55 (1st Cir. 1986) (citing Roto-Lith); Alloy Computer Products, Inc. v. Northern Telecom, 683 F.Supp. 12 (D.Mass. 1988); Gilbert & BennettMfg. Co. u. Westinghouse Elec., 445 F.Supp. 537 (D.Mass. 1977).

See, e.g., LuriaBros. & Co. v. PieletBros. Scrap Iron, 600 F.2d 103, 113 (7th Cir. 1979) (Roto-Lith “has been severely criticized by the commentators and often not followed by the courts”); C. Itoh & Co. u. Jordan International Co., 552 F.2d 1228, 1235 n.5 (7th Cir: 1977): Polyclad Laminates, Inc. v. VITSMaschinenbau, 749 F.Supp. 342, 344 (D.N.H. 1990); St Charles Cable TV v. Eagle Comtronics, Inc., 687 F.Supp. 820, 828(S.D.N.Y. 1988), affirmed without opinion, 895F.2d 1410 (2nd Cir. 1989) (“The Roto-Lith approach has been criticized extensively for confounding the plain language of §2-207 and subverting the purpose of the provision”): Leonard Pevar v. Evans Product Co., 524 F.Supp. 546, 551 (D.Del. 1981) [“Roto-Lith has been widely criticized because it does not reflect the underling principles of the Code”); EBASCO Services, Inc. v. Pennsvlvania Power & L. Co., 402 F.Supp. 421, 436-38 (E.D.Penn. 1975); Rite Fabrics, Inc. v. Stafford-Higgirvs Co., Inc., 366 F.Supp. 1, 8 (S.D.N.Y. 1973) (noting that Roto-Lith has been widely criticized); Gardner Zemke Co. v. DunhamBush, Inc., 850 P.2d 319, 323 (N.M. 1993) (“Roto-Lith has been almost uniformly criticized by the courts and commentators as an aberration in Article 2 jurisprudence”); J. White & R. Summers, Handbook of the Law Under the Uniform Commercial Code 26-28 (1972); Recent Cases: Commercial Law-Roto-Lith, Ltd. v. F.P. Bartlett & Co., (1st Cir. 1962), 76 Harv. L. Rev. 1481, 1482-83 (1962) (“Despite the court’s apparent self-assurance, the decision seems subject to serious question . . . Such judicial revision — especially of legislation designed to make uniform the laws of numerous states — must be highly suspect unless otherwise forcefully justified”).

Although the Appellate courts of Massachusetts have not had occasion to visit this issue, this Court is of the opinion that they would not adopt the Roto-Lith approach to §2-207.

“[T]he fact of shipment in Roto-Lith tends to negate the court’s.assumption that the seller could not have believed an enforceable agreement to have been consummated.” Recent Cases: Commercial Law — Roto-lith, Ltd. v. F.P. Bartlett & Co., (1st Cir. 1962), 76 Harv. L. Rev. 1481, 1483 (1962).

Roto-Lith did not address the consequences of the parties, conduct under §2-207(3).

The Court recognizes that the indemnification clause was not the only condition listed on the Delivery Reports, but it need only consider this clause.

 incidentally, the Delivery Reports upon which IFC relies have not been signed by an S&F representative.