### 29392, 29393. DUVAL & COMPANY v. MALCOM et al.; and vice versa.

HALL, Justice.

This equity case involves a purported contract for the sale of cotton, and comes here on certificates from the denial of cross motions for summary judgment. We affirm.

Malcom et al., defendants-growers, in March of 1973 tendered to Mr. Duval, agent for plaintiff-buyer, a signed document constituting a proposed contract, offering to sell their "entire crop of 1973 cotton of 729.6 acres plus any addition that may be leased prior to planting." Price and terms were set out. Apparently this document had been drafted by buyer, and the record made on these cross motions did not show that any agreement was reached orally prior to the writing. Growers' understanding was that buyer would execute the proposed contract out of their presence and they thereupon left for lunch, returning to pick up their copy and discovering that prior to executing the document buyer had added language to it. Specifically, to the front of the document these words were added: "Projected yields and farm numbers on back." The back of the document listed 15 farms by number, acreage of each, and this language: "600 pounds per acre or approximately 875 b/c [bales of cotton]." Growers vehemently protested this addition, declaring their belief that no contract existed, and refusing to be bound by any estimate. The record showed their 1971 crop on basically this acreage had been 756 bales which they sold under contract to buyer, and their 1972 crop, which they did not sell to buyer, had been only 380 bales. Buyer then added yet more language to the back of the document: "Buyer will accept all of the cotton produced on this acreage regardless of whether it is more or less than the projected yield." Growers reiterated their belief that no contract existed, and left. Some months later, on September 10th

1973, growers' attorney wrote buyer informing buyer that growers considered the "contract" nonexistent. Buyer's suit for specific performance followed.

Our first task on this appeal is to characterize buyer's response to growers' offer: was it an acceptance or was it a counter-offer? Buyer urges that the added language was of no legal effect and constituted only an immaterial alteration not shown to be fraudulent, citing Code §§ 20-802 and 20-803. These sections are inapplicable because they presuppose that a contract exists, and our task is to ascertain whether the point of contracting was ever reached by these parties. Nor can we do as buyer asks and lump the two episodes of document modification together. What was initially proffered to growers was not the estimate plus the "more or less" language, but the estimate language alone; and the effect of this proffer must be determined.

Following growers' offer of an output contract specifying no amount (see *Harris v. Hine,* 232 Ga. 183 (205 SE2d 847)), buyer added an "estimate" of the number of bales to be delivered. We temporarily stop here, for purposes of this analysis. In this factual context, by reason of Code Ann. § 109A-2—306 defining an output contract, buyer's addition would materially have changed the proposed agreement to the growers' disadvantage. That section provides that where no estimate is stated seller is limited only in that he may not tender an amount unreasonably disproportionate to "comparable prior output," that is, 756 bales in 1971 but only 380 bales in 1972; whereas where an estimate is stated, the tender must not be unreasonably disproportionate to the estimate — 875 bales. Thus, buyer attempted a material alteration in the quantity term though he argues that his conduct amounted to an acceptance. We cannot agree under traditional offer-acceptance rationale, nor does the Uniform Commercial Code change the result here. Though the Uniform Commercial Code does apply to this purported cotton agreement (Code Ann. §§ 109A-2—105 (1), 109A-2—102) it is important to note here that Code Ann. § 109A-2—207 is inapplicable because we do not have a "definite and seasonable expression of acceptance" which "states terms additional

to or different from those offered" within the meaning of Section 207. That section, which is designed to avoid frustrating the parties' actual intent to agree merely because the wording of their forms is conflicting (see generally, Kock, Georgia Commercial Practice, § 1-3 (1964)), is described as follows in Official Comments 1 and 2 thereto:

"1. This section is intended to deal with two typical situations. The one is where an agreement has been reached either orally or by informal correspondence between the parties and is followed by one or both of the parties sending formal acknowledgments or memoranda embodying the terms so far as agreed upon and adding terms not discussed. The other situation is one in which a wire or letter expressed and intended as the closing or confirmation of an agreement adds further minor suggestions or proposals such as 'ship by Thursday,' 'rush,' 'ship draft against bill of lading inspection allowed,' or the like.

"2. Under this Article a proposed deal which in commercial understanding has in fact been closed is recognized as a contract. Therefore, any additional matter contained either in the writing intended to close the deal or in a later confirmation falls within subsection (2) and must be regarded as a proposal for an added term unless the acceptance is made conditional on the acceptance of the additional terms." UCC Reporting Service, Par. 2207 (Callahan & Company, 1967).

We conclude that the section is inapplicable because under the evidence adduced on the motions, no deal had in fact been closed, and there was no meeting of the minds of the parties. The question whether there has been acceptance is answered not only by reference to Section 2-207, but also to Sections 2-204 and 2-206. 3 Duesenberg & King, Sales and Bulk Transfers Under the Uniform Commercial Code §§ 3.03[1][a], 3.05 (Bender & Co., 1966). The thrust of those sections is to require that the parties reach agreement: "The concepts of mutual assent and intention to accept the terms of an offer are not jettisoned by the Code, and a variance of the type suggested [a price disagreement] is so great that, irrespective of the words used, there should not be held to have come into existence

a binding contract . . . Only where all the traditional criteria are met showing that a contract has been made should Section 2-207 be applied; only then should the presumptions of Section 2-207 as to additional terms become relevant. Basically, Section 2-204 controls as to when a contract is formed, and that section includes the requirement that the facts must 'show agreement.' " Id., § 3.05.

Because Code Ann. § 109A-2—207 is inapplicable, we apply traditional offer-acceptance analysis and find that the "estimate" language constituted a counter-offer because of the variation in terms. E.g., *Frey v. Friendly Motors, Inc.,* 129 Ga. App. 636 (200 SE2d 467); *State Highway Dept. v. Wright Contracting Co.,* 107 Ga. App. 758, 766 (131 SE2d 808, 1 ALR3d 1260). See Code § 20-107. The conclusion follows that growers had the right to and did refuse their agreement to the estimate language (the counter-offer) proposed by buyer, and no contract was reached at that point. Moreover, because a counter-offer operates to reject the offer and to terminate the power of acceptance (Peerless Cas. Co. v. Housing Authority &c. of Hazelhurst, 228 F2d 376 (5th Cir. 1955), 1 Corbin, Contracts, § 90 (1963)), the initial offer was no longer outstanding and could not later be accepted unless renewed. Assuming, without in any way deciding, that the addition of the "more or less" language would have cured the problem we find with the earlier "estimate" language, there is a question of fact whether at the time of the "more or less" language there was in existence any offer which buyer by the use of appropriate language might accept. Thus, buyer has failed to prove the contract he seeks to sue upon, and his summary judgment motion was properly denied. See Code Ann. § 81A-156 (c).

Similarly, growers have failed to show entitlement to summary judgment because, construing every inference against them as we must on their motion (*Tipton v. Harden,* 128 Ga. App. 517, 519 (197 SE2d 746)), they have not carried the burden of proving the negative, that is, of ruling out as a matter of law all possibilities of the contract that buyer claims could have been reached. See *Price v. B-Line Systems, Inc.,* 129 Ga. App. 34, 35 (198 SE2d 328). There are questions of fact yet to be resolved. The

denial of their summary judgment motion was also correct.

Although a question of fact remains whether a contract existed between the parties, the further question arises whether buyer would be entitled to specific performance or merely damages if he proved the contract.

"The general rule is that specific performance of contracts in relation to personal property will not be enforced, for the reason that ordinarily compensation for breach of contract may be had by way of an action at law for damages. . . For example, equity will usually decline specific performance of contracts of sale of commodities such as coal, oil, and cotton, . . . The rule is simply a corollary of the principle upon which equity acts in decreeing specific performance, namely, the inadequacy of the remedy at law for damages. . ." 71 AmJur2d 197, Specific Performance, § 152 (1973). A prime example of this principle is found in *Rimes v. Rimes,* 152 Ga. 721 (111 SE 34, 22 ALR 1030), a suit for specific performance of the sale of corporate stock which would give plaintiff control of the corporation. This court held that specific performance would not lie in the absence of a showing that plaintiff could not obtain other shares of the stock in the open market. The mere fact that plaintiff might be compelled to pay an unreasonable price for the stock is not a ground for equitable relief but rather relates to the amount of his damages at law. See also Walsh, Equity, 305, § 60 (1930); de Funiak, Handbook of Modern Equity, 162, § 71 (2d Ed. 1956). "Ordinarily, an action at law for money damages affords a plain, adequate, and complete remedy for breach of a contract for the sale of goods for the purpose of resale, so as to preclude a suit in equity for specific performance, and this is true although the subject matter of the contract is essential to the carrying on of the complainant's business. . ." 71 AmJur2d 204, Specific Performance, § 157 (1973).

Buyer contends that these principles of equity have been substantially modified by the Uniform Commercial Code provisions on remedies for breach of contracts for the sale of goods. Code Ann. §§ 109A-2—711 and 109A-2—716. The latter section provides in part that "Specific performance may be decreed where the goods are

unique or in other proper circumstances." Uniqueness has always been an equitable test; the "other proper circumstances" test is at best a vague and general rule which liberally construed without proper guidelines would seem to afford specific performance for all commercial goods and turn the courts into referees in commerce. This is plainly unworkable. An authority on sales has criticized the Code's "strange statutory language" on specific performance and says that "courts are free to go on doing what they did before the Code . . ." Nordstrom, Sales, § 158, 479, 480. Buyer has alleged that it "cannot go into the market and replace said cotton due to the uniqueness which now exists in the market." We note here that the mere fact that cotton prices soared after this alleged contract is not in itself adequate to show buyer entitled to specific performance.

The trial court did not err in denying both motions for summary judgment.

*Judgments affirmed. All the Justices concur, except Ingram, J., who concurs in the judgment, and Gunter and Jordan, JJ., who dissent.*

ARGUED NOVEMBER 13, 1974 — DECIDED FEBRUARY 5, 1975 — REHEARING DENIED FEBRUARY 25, 1975.

*Preston & Allgood, William L. Preston,* for appellant.
*Campbell & Bouchillon, W. K. Campbell,* for appellees.