March 12, 1993 UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 91-2244

GEORGE LAMBERT, d/b/a RAINBOW FRUIT,

Plaintiff, Appellant,

v.

SAM KYSAR AND JOAN KYSAR,
d/b/a LEWIS RIVER TREE FARM,

Defendants, Appellees.

No. 92-1029

GEORGE LAMBERT, d/b/a RAINBOW FRUIT,

Plaintiff, Appellant,

v.

SAM KYSAR AND JOAN KYSAR,
d/b/a LEWIS RIVER TREE FARM,

Defendants, Appellees.

ERRATA SHEET

The opinion of this Court issued on January 13, 1993, is
amended as follows:

Cover sheet: Spelling of last name of appellant's counsel
should be "Gillis";

Page 9, line 7: change "1988" to "1989";

Page 14, line 4: change "1988" to "1989." January 13, 1993

January 13, 1993 UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 91-2244

GEORGE LAMBERT, d/b/a RAINBOW FRUIT,

Plaintiff, Appellant,

v.

SAM KYSAR AND JOAN KYSAR,
d/b/a LEWIS RIVER TREE FARM,

Defendants, Appellees.

No. 92-1029

GEORGE LAMBERT, d/b/a RAINBOW FRUIT,

Plaintiff, Appellant,

v.

SAM KYSAR AND JOAN KYSAR,
d/b/a LEWIS RIVER TREE FARM,

Defendants, Appellees.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Edward F. Harrington, U.S. District Judge]

Before

Cyr, Circuit Judge,

Campbell, Senior Circuit Judge,

and Fust ,* District Judge.

Brian A. Gillis with whom Parker, Coulter, Daley & White was on

brief for appellant.

James A. G. Hamilton with whom Perkins, Smith & Cohen was on

brief for appellees.

*Of the District of Puerto Rico, sitting by designation.

CYR, Circuit Judge. George Lambert appeals a district court
CYR, Circuit Judge.

order dismissing his lawsuit for improper venue. We affirm.

I

BACKGROUND

Appellant Lambert owns and operates the Rainbow Fruit

Company in Boston, Massachusetts, which sells Christmas trees and

wreaths at retail during the holiday season. Appellees Sam and Joan

Kysar operate a Christmas tree farm in Woodland, Washington. From

1987 through 1989, Lambert purchased Christmas trees at wholesale from

the Kysars pursuant to a written form contract signed by both parties.

The front of the order form contained spaces in which the size, grade,

quantity, and price of each Christmas tree order could be filled in;

a small space at the bottom of the page, denominated "other", was used

by the parties to note additional terms and conditions. The back of

the order form stated the fixed terms of the contract and provided,

inter alia, that

"[t]he terms and conditions of the order documents
applicable to this transaction shall be interpret-
ed under the case and statutory law of the State
of Washington. In the event any action is brought
to enforce such terms and conditions, venue shall
lie exclusively in Clark County, Washington."

In July 1989, the Kysars visited Boston to discuss Lambert's

needs for the upcoming Christmas season. On their return to Washing-

ton, they sent Lambert an order form, filled out and signed by Joan

3

Kysar. The numbers handwritten on the form by Joan Kysar provided for

an order of 2600 Christmas trees at $11.60 apiece. At the bottom of

the form, in the space marked "other", Kysar wrote that the order was

"[b]ased on 4 loads of 650 trees each. All trucks will be loaded to

capacity. 25% deposit . . . balance due on or before 12/10/89."

Lambert received the order form in late July, but apparently

thought that it overstated the quantity of trees needed for the next

season. Writing on the same order form submitted by the Kysars, he

changed the notation "4 loads of 650 trees each," to read "3 loads of

550 trees", and changed the total number ordered from "2600" to

"1650." Lambert also recomputed the total amount due and the amount

of the required 25% deposit. He inserted the new figures over Joan

Kysar's handwritten figures at the bottom of the form, and returned

the form to the Kysars. He made no change to the $11.60 unit price or

to any other contract provision.

On August 21, 1989, in a letter to Sam and Jean Kysar,

Lambert enclosed a $4785 check "for payment of the deposit on our tree

order", and stated his understanding "that shipping will be the same

as last year. There will be three loads of 1,650 trees at $11.60 for

a total cost of $19,140." The record on appeal does not indicate

whether the Kysars received Lambert's letter, cashed his deposit

check, or issued any written response, but on November 20, 25 and 29,

in accordance with the instructions on the altered order form, the

Kysars sent Lambert the requested 1,650 trees, in three loads, by

overland truck. Following delivery of the trees on November 25, 29,

4

and December 1, Lambert's inspection allegedly revealed that the trees

"were dry, not fresh, and appeared old." Citing the allegedly defec-

tive condition of the trees, Lambert refused to pay the balance

claimed by the Kysars.

In June, 1991, the Kysars filed suit in Clark County,

Washington, to recover the balance claimed due. In September, 1991,

Lambert filed the present countersuit against the Kysars in Massa-

chusetts Superior Court, alleging misrepresentation, breach of con-

tract, breach of implied warranty, and unfair business practices under

Mass. Gen. L. ch. 93A. The Kysars removed Lambert's suit to federal

district court and moved to dismiss under Federal Rules 12(b)(3) and

12(b)(6), alleging improper venue and failure to state a claim on

which relief could be granted.1

On November 18, 1991, the motion to dismiss was granted

without hearing, by margin order: "[The defendants'] motion to

dismiss is allowed. According to the terms of contract[,] suit must

be filed in State Court in Washington." We review the district court

dismissal order de novo. See Edwards v. John Hancock Mut. Life Ins.

Co., 973 F.2d 1027, 1028 (1st Cir. 1992); see also Instrumentation

Assocs., Inc. v. Madsen Electronics (Canada) Ltd., 859 F.2d 4, 5 (3d

1The Kysars invoked Rule 12(b)(3) as the procedural vehicle for urging
dismissal under the forum selection clause in the order form. We have
held that such dismissals are founded on Rule 12(b)(6), see LFC

Lessors, Inc. v. Pacific Sewer Maintenance Corp., 739 F.2d 4, 7 (1st

Cir. 1984). No matter, however, since "we are not bound by the label
employed below, and we agree that the case should have been dis-
missed." See id. (quoting Carr v. Learner, 547 F.2d 135, 137 (1st

Cir. 1976)).

5

Cir. 1988) (de novo review of forum selection clause dismissal under

Rule 12(b)(6)); compare, e.g., Pelleport Investors, Inc. v. Budco

Quality Theatres, 741 F.2d 273, 280 n.4 (9th Cir. 1984) ("abuse of

discretion" review of forum selection clause dismissal under Rule

12(b)(3)).

II

DISCUSSION

The order form filled out by Joan Kysar, and amended by

Lambert in July 1989, provided, inter alia, that "[i]n the event any

action is brought to enforce [the] terms and conditions [of the order

documents], venue shall lie exclusively in Clark County, Washington."

The Kysars assert, and the district court impliedly found, that the

order form expressed the terms and conditions of the agreement between

the parties and that Lambert is bound by the choice of forum made in

the order form. Lambert vigorously disagrees. According to Lambert,

the changes he made to the quantity term on the Kysars' order form

amounted to a material alteration (and therefore a rejection) of the

Kysar offer, paving the way for a counteroffer in the form of Lam-

bert's August 21 letter. Since the August 21 letter contained neither

a forum selection clause nor an express choice-of-law provision,

Lambert asserts that venue and choice-of-law rules are to be deter-

mined under general common-law and statutory principles. In particu-

lar, Lambert asserts, the Massachusetts venue remains proper under the

6

general rules applicable to removed cases in federal courts, i.e., 28

U.S.C. 1441.2

We agree with the first part of Lambert's argument. The

changes Lambert made to the quantity term amounted to a rejection

2Lambert's opposition to the Kysars' motion to dismiss also seems to
assert: (1) that the Kysars waived their right to plead improper
venue by filing the removal petition, thereby implicitly acknowledging
the district court's authority to hear the case; and (2) that even if
the removal petition did not constitute a per se waiver of their right

to plead improper venue, in the present case waiver can be implied
from the representation made in the removal petition that "[v]enue in
[Massachusetts federal] Court [was] proper under 28 U.S.C. 1391."
Neither assertion is sound. Although it is axiomatic that a defendant
must mount any challenge to venue at the earliest possible opportuni-
ty, see Graver Tank & Mfg. Corp. v. New England Terminal Co., 125 F.2d

71, 74 (1st Cir. 1942), the Kysars properly preserved their right to
challenge venue by raising it in the state court action and renewing
it in their first pleading following removal. It is well settled that
the filing of a removal petition in a diversity action, without more,
does not waive the right to object in federal court to the state court
venue. In order to obtain the benefits of a federal forum in diversi-
ty cases, "[the] removal must be 'into the district where such suit is

pending'[; n]o choice is possible and for that reason nothing in
respect to venue can be waived." Moss v. Atlantic Coast Line R. Co.,

157 F.2d 1005 (2d Cir. 1946), cert. denied, 330 U.S. 839 (1947)

(emphasis added).
This analysis is not altered by the Kysars' assertion, in their
removal petition, that venue in Massachusetts federal district court
was proper under 28 U.S.C. 1391. Even if their assertion could be
construed as a waiver of any objection to venue under 28 U.S.C.
1391, the venue of a removed action is not governed by 1391, but by
28 U.S.C. 1441(a). Indeed, removal of an action to a proper forum
under 1441(a) frequently has been considered a waiver or cure of any
defect in the original venue of the removed action under 28 U.S.C.
1391. See Polizzi v. Cowles Magazines, Inc., 345 U.S. 663, 665

(1953); Seaboard Rice Milling Co. v. Chicago, R.I. & P.R. Co., 270

U.S. 363 (1926); Minnesota Mining & Mfg. Co. v. Kirkevold, 87 F.R.D.

317, 321-22 (D. Minn. 1980); Tanglewood Mall, Inc. v. Chase Manhattan

Bank, 371 F. Supp. 722, 725 (W.D. Va.), aff'd, 508 F.2d 838 (4th Cir.

1974), cert. denied, 421 U.S. 965 (1975). Here, of course, a differ-

ent issue is presented, since a valid forum selection clause operates
to render the venue improper, not only under 1391, but also under

1441(a).

7

under Article 2 of the Uniform Commercial Code, and the Kysars'

performance of the new contract amounted to an acceptance of the new

terms proposed by Lambert. We disagree with the second part of

Lambert's argument, however. Lambert's counteroffer was made in July,

when he amended the order form containing the Kysars' original offer,

not in Lambert's August 21 letter. Accordingly, the counteroffer

incorporated the unamended terms and conditions contained in the

original offer, including its venue and choice-of-law clauses. Since

the venue clause impliedly mandating a Washington forum is

enforceable under both state and federal common law, the district

court properly dismissed the action.

A. The Contract

The parties disagree on whether a Massachusetts court would

apply Massachusetts or Washington law to the formation of their

contract. See Klaxon v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941)

(federal court sitting in diversity must apply forum state's choice-

of-law rules). We need not resolve the issue, however, as the outcome

is the same under the substantive law of either jurisdiction. See

Cohen v. McDonnell Douglas Corp., 389 Mass. 327, 332, 450 N.E.2d 581,

584 (1983) ("the usual first step in applying conflict of laws prin-

ciples is to determine whether there is a conflict among the laws of

the various states involved").

Christmas trees are "goods" within the meaning of Uniform

Commercial Code, Article II, as adopted in both Massachusetts and

8

Washington.3 Moreover, the common law of both jurisdictions, which

remains in force under the U.C.C. except as displaced, see U.C.C. 1-

103, Mass. Gen. L. ch. 106 1-103, Wash. Rev. Code 62A.2-103, sup-

ports the validity and enforceability of the subject contract, includ-

ing its forum selection clause.

Under the law of both Massachusetts and Washington, the

order form (signed and forwarded to Lambert in July 1989) comprised an

offer to contract in accordance with its terms.4 It set forth in

detail all the material terms essential to the proposed transaction,

including the price, quantity and quality of the goods. It provided a

3Christmas trees have been described as "growing crops or other things
attached to realty and capable of severance without material harm
thereto," U.C.C. 2-107, Mass. Gen. L. ch. 106 2-107(2) (1979);
Wash. Rev. Code 62A.2-107(2). See Groth v. Stillson, 174 N.W.2d 596,

598 (Mich. App. 1969); cf. Rainier Nat'l Bank v. Security State Bank,

59 Wash. App. 161, 796 P.2d 443 (1990), rev. denied, 117 Wash. 2d

1004, 815 P.2d 166 (1991) (Christmas trees are "growing crops" for
purposes of Article 9). Alternatively, though somewhat less plausi-
bly, the parties' July arrangement for delivery of Christmas trees
might be viewed as a contract for sale of "timber to be cut." U.C.C.
2-107, Mass. Gen. L. ch. 106, 2-107(2) (1979); Wash. Rev. Code
62A.2-107(2). In either event, a sale of Christmas trees is a "trans-
action in goods" governed by the Uniform Commercial Code. See U.C.C.

2-105, Mass. Gen. L. ch. 106 2-105(1); Wash. Rev. Code 62A.2-105;
see also Traynor v. Walters, 342 F.Supp. 455, 459 (M.D. Pa. 1972);

Kirk Co. v. Ashcraft, 684 P.2d 1127 (N.M. 1984); Whewell v. Dobson,

227 N.W.2d 115, 117 (Iowa 1975).

4As the evidentiary foundation for determining the formation of the
parties' contract was either undisputed or consisted of writings,
Lambert's present challenge raises issues of law for the court.
Ismert & Associates, Inc. v. New England Mut. Life Ins. Co., 801 F.2d

536 (1st Cir. 1986) (citing David J. Tierney, Jr., Inc. v. T. Welling-

ton Carpets, Inc., 8 Mass. App. Ct. 237, 239, 392 N.E.2d 1066, 1068

(1979)); Bresky v. Rosenberg, 256 Mass. 66, 75, 152 N.E. 347, 351

(1926); R.J. Menz Lumber Co. v. E.J. McNeeley & Co., 58 Wash. 223,

229, 108 P. 621, 624 (1910). Lambert adverts to no other evidence
which would alter the result reached here.

9

space for Lambert's signature, to indicate that he had "read and

accept[ed] the Terms of Sale on the reverse side of th[e] document."

It included the signature of Joan Kysar, an officer of Lewis River

Tree Farm, indicating assent to be bound. See Restatement (Second) of

Contracts 24 (offer is "manifestation of willingness to enter into a

bargain, so made as to justify another person in understanding that

his assent to that bargain is invited and will conclude it"); Gilbert

& Bennett Mfg. Co. v. Westinghouse Elec. Corp., 445 F. Supp. 537, 544

(D. Mass. 1977) ("an offer is made when the offeror leads the offeree

to reasonably believe that an offer has been made"). Although the

back of the form included a provision for "approval" by the Lewis

River Tree Farm's "main office", Joan Kysar's status as an officer of

the company and her signature on the front of the form reasonably

denoted such approval. Compare Kuzmeskus v. Pickup Motor Co., 330

Mass. 490, 493, 115 N.E.2d 461, 464 (1953) (contract proffered by

company's general manager, which contained clause requiring authoriza-

tion by seller's corporate officer, and blank space for officer's

signature, held to be "no more than an invitation or request to give

orders on the terms and conditions therein stated"; "[i]f the general

manager was an officer of the company with power to authorize the

sales, he said or did nothing to inform the plaintiff that he was

taking favorable action").

Under the law of both Washington and Massachusetts, Lam-

bert's substitution of a substantially lower quantity term amounted to

a rejection of the Kysars' offer to sell, and a counteroffer to

10

purchase the lesser quantity of trees.5 See Minneapolis & St. L.R.

v. Columbus Rolling-Mill Co., 119 U.S. 149 (1886) (order for 1200 tons

of steel rails indicated rejection of offer to sell 2000-5000 tons of

rails); see generally Restatement (Second) of Contracts 59 ("a

reply to an offer which purports to accept it but is conditional on

the offeror's assent to terms additional to or different from those

offered is not an acceptance but is a counteroffer"); Banks v. Cres-

cent Lumber & Shingle Co., 61 Wash.2d 528, 530-31, 379 P.2d 203

(1963); Owens-Corning Fiberglas Corp. v. Fox Smith Sheet Metal Co., 56

Wash.2d 167, 170, 351 P.2d 516, 518 (1960); Champlin v. Jackson, 317

Mass. 461, 463-64, 58 N.E.2d 757 (1945); Kehlor Flour Mills v. Linden,

230 Mass. 119, 123, 119 N.E. 698 (1918). Lambert's counteroffer to

purchase, made on the same form as the Kysars' offer to sell, and

containing Lambert's signature indicating that he had "read and

accept[ed] the Terms of Sale on the reverse side," incorporated all

the unamended terms in the original offer form; that is, all its terms

except the quantity of trees.6 See Construction Aggregates Corp. v.

Hewitt-Robins Inc., 404 F.2d 505 (7th Cir. 1968), cert. denied, 395

5Our analysis makes it unnecessary to address Lambert's argument that
the same result might be reached by crediting the printed condition on
the reverse side of the order form: "No modifications of the terms of
this agreement shall be effective unless reduced to writing and
executed in writing by both parties hereto."

6Lambert's August 21, 1989 letter of confirmation ratified and
reconfirmed the terms of his counteroffer. The letter referred to
"our tree order" and enclosed a deposit for the quantity of trees
Lambert ordered. Nowhere did it indicate that the counteroffer was
being revoked or made conditional on an assent to any additional term.

11

U.S. 921 (1969) (seller's stated objection to one term of counteroffer

may be treated as acquiescence in remaining terms); cf. Romala Corp.

v. United States, 927 F.2d 1219, 1221 (Fed. Cir. 1991) (seller's

submission of purchaser's bid form, altering some paragraphs but not

others, amounted to acquiescence in unaltered terms).

Since Lambert's alteration of the quantity term amounted to

a rejection of the original offer, rather than a mere modification or

supplementation of the boilerplate language in the original offer

form, this is not an appropriate case for the application of U.C.C.

2-207(2), Mass. Gen. L. ch. 106 2-207(2), Wash. Rev. Code 62A.2-

207(2). See, e.g., Duval & Co. v. Malcom, 233 Ga. 784, 787, 214

S.E.2d 356, 358 (1975) (holding 2-207 inapplicable where offer and

purported acceptance differed on quantity of goods to be sold); see

generally James J. White & Robert S. Summers, Uniform Commercial Code,

1-3, p. 33 (3d ed. 1980) [hereinafter: White & Summers] (suggesting

inapplicability of U.C.C. 2-207 in cases of substantial divergence,

e.g., where forms "diverge as to price, quality, quantity, or delivery

terms") (emphasis added). Since U.C.C. 2-207 is inapplicable to the

facts of this case, we need not consider the apparent conflict between

our interpretation of 2-207 in Roto-Lith, Ltd. v. F.P. Bartlett &

Co., 297 F.2d 497 (1st Cir. 1962), and the interpretation adopted by

the courts of Washington and other jurisdictions.7

7Roto-Lith holds, as a matter of Massachusetts law, that a purported

acceptance "which states a condition materially altering the obliga-
tion solely to the disadvantage of the offeror" operates as a counter-
offer expressly conditioned on the offeror's assent to the additional

12

Whether the Kysars accepted Lambert's counteroffer in

August, by accepting his deposit check, see Rockwood Mfg. Corp. v.

AMP, Inc., 806 F.2d 142, 144-145 (7th Cir. 1986) ("the act of cashing

a check can function as an acceptance of an offer in certain circum-

stances") (collecting cases); cf. Hobbs v. Massasoit Whip Co., 158

Mass. 194, 197, 33 N.E. 495, 495 (1893) ("conduct which imports

acceptance or assent is acceptance or assent in the view of the law"),

or by seasonably shipping the number of Christmas trees requested in

Lambert's counteroffer, see U.C.C. 2-206(1) ("an offer to make a

contract shall be construed as inviting acceptance in any manner and

by any medium reasonable under the circumstances"); see also U.C.C.

2-206(2) ("an offer to buy goods for prompt or current shipment

shall be construed as inviting acceptance . . . by the prompt or

term. 297 F.2d at 500; see also Teradyne, Inc. v. Mostek Corp., 797

F.2d 43, 55 (1st Cir. 1986) (citing Roto-Lith); Gilbert & Bennett

Mfg., 445 F. Supp. at 546 (same). The Roto-Lith rule has never been

repudiated by the Massachusetts Supreme Judicial Court ("SJC"), though
it has been received critically by commentators, see, e.g., White &

Summers at 33, and its precedential value has been questioned. See

Polyclad Laminates, Inc. v. Vits Maschinenbau GmBH, 749 F. Supp. 342,

344 (D. N.H. 1990); St. Charles Cable TV, Inc. v. Eagle Comtronics,

Inc., 687 F. Supp. 820, 828 n.19 (S.D.N.Y. 1988).

The Washington Supreme Court appears not to have ruled on the
issue, but in Hartwig Farms, Inc. v. Pacific Gamble Robinson Co., 28

Wash. App. 539, 543-44, 625 P.2d 171, 174 (1981), the Washington Court
of Appeals expressly declined to follow Roto-Lith, holding that the

addition of a material term in the buyer's acceptance did not amount
to a rejection. Rather, the terms on which parties do not expressly
agree "dropped out" of the contract and were replaced (where possible)
by the U.C.C.'s "gap-filler" provisions. See, e.g., U.C.C. 2-306(1),

Wash. Rev. Code 62A.2-306(1) (implying quantity term in output and
requirements contracts; measuring quantity in these cases by "such
actual output or requirements as may occur in good faith"). See

generally White & Summers, at 38-40 (3d ed. 1988) (collecting cases,

and discussing proper interpretation of UCC 2-207).

13

current shipment of conforming or non-conforming goods"), under the

law of both Washington and Massachusetts the Kysars accepted Lambert's

counteroffer by November 1989 at the latest. The Kysars' acceptance,

whenever it is deemed to have occurred, operated under the law of both

jurisdictions to bind the contracting parties to all terms printed on

the reverse side of the original order form, including the forum

selection clause.8

B. The Forum Selection Clause

We turn to the forum selection clause. Federal courts have

long enforced forum selection clauses as a matter of federal common

law. See The Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 10 (1972)

(forum clauses "are prima facie valid and should be enforced unless

enforcement is shown by the resisting party to be 'unreasonable' under

the circumstances"); Docksider, Ltd. v. Sea Technology, Ltd., 875 F.2d

762, 764 (9th Cir. 1989) ("The prevailing rule is clear... that where

venue is specified with mandatory language the clause will be en-

forced"). Washington state law on the validity and enforcement of

forum selection clauses is drawn from the Restatement (Second) of

Conflict of Laws, see Exum v. Vantage Press, Inc., 17 Wash. App. 477,

478, 563 P.2d 1314, 1315 (1977), which appears generally to accord

with federal common law. See Zapata, 407 U.S. at 11 and n.13 (citing

8Lambert makes no claim that the forum selection clause was
insufficiently conspicuous.

14

Restatement (Second) of Conflict of Laws 80); see also Willis

Reese,9 Supreme Court Supports Enforcement of Choice of Forum Claus-

es, 7 Intl. L. 530 (1972) ["Supreme Court Supports Enforcement"]

(expressing view that Zapata analysis should be persuasive in state

law context). Thus, as we discern no material discrepancy between

Washington state law and federal law, we need confront neither the

choice-of-law issue nor the daunting question whether forum selection

clauses are to be treated as substantive or procedural for Erie

purposes.10 See Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.,

9Professor Reese served as Reporter for the Restatement (Second).

10The Supreme Court has yet to provide a definitive resolution of the
Erie issue, see Stewart Organization, Inc. v. Ricoh Corp., 487 U.S.

22, 28-29 (1987) (declining to reach Erie issue), which has divided

the commentators and split the circuits. The Second, Ninth and
Eleventh Circuits essentially treat forum clauses as procedural, and
apply federal common law to determine their validity in diversity
cases. See Jones v. Weibrecht, 901 F.2d 17, 19 (2d Cir. 1990);

Manetti-Farrow, Inc. v. Gucci America, Inc., 858 F.2d 509 (9th Cir.

1988); Stewart Organization v. Ricoh Corp., 810 F.2d 1066 (11th Cir.

1986) (en banc), aff'd on other grounds, 487 U.S. 22 (1988); see also

Taylor v. Titan Midwest Constr. Corp., 474 F.Supp. 145 (N.D. Tex.

1979) (applying federal common law on policy grounds, without consid-
ering Erie issue); cf. Northwestern Nat'l. Ins. Co. v. Donovan, 916

F.2d 372, 374 (7th Cir. 1990) (Posner, J.) (suggesting that the
application of federal common law is "probably correct"). The Third
and Eighth Circuits, and Justice Scalia (who sought to reach the Erie

issue in Stewart), seem to view forum selection clauses as substan-

tive, and would apply state law to determine their validity in the
diversity context. See Stewart Organization, 487 U.S. at 38-41

(Scalia, J., dissenting); General Eng'g Corp. v. Martin Marietta

Alumina, Inc., 783 F.2d 352, 356 (3rd Cir. 1986); Farmland Indus. v.

Frazier-Parrott Commodities, Inc., 806 F.2d 848 (8th Cir. 1986); but

see Sun World Lines, Ltd. v. March Shipping Corp., 801 F.2d 1066, 1069

(8th Cir. 1986) (applying federal common law) (alternate holding).
This court has yet to take a position on the issue, although district
courts within the circuit have endorsed the Ninth and Eleventh Circuit
approach, see, e.g., Northeast Theatre Corp. v. Edie & Ely Landau,

Inc., 563 F. Supp. 833 (D. Mass. 1983), and on one occasion we tenta-

15

709 F.2d 190 (3rd Cir. 1983) (declining to reach Erie issue because

state law and federal law did not conflict).

Relying on early Massachusetts decisions, however, Lambert

argues that forum selection clauses which oust the jurisdiction of

Massachusetts courts are unenforceable under Massachusetts law. See

Nashua River Paper Co. v. Hammermill Paper Co., 223 Mass. 8, 111 N.E.

678 (1916); see also Nute v. Hamilton Mut. Ins. Co., 72 Mass. (1

Gray) 174 (1856) (intrastate forum clause); cf. Cadillac Auto. Co. v.

Engeian, 339 Mass. 26, 29, 157 N.E.2d 657, 659 (1959) (holding forum

selection clauses "generally" unenforceable under Massachusetts law,

but noting conflicting caselaw authority, and declining to reach the

issue). It is true that these decisions are still cited and followed,

at least in circumstances where the defendant invokes a forum selec-

tion clause in an attempt to deprive the Massachusetts forum of

jurisdiction. See J.S.B. Industries v. Bakery Machinery Distrib.,

1991 Mass. App. Div. 1, 1-2 (1991) (holding contractual selection of

New York forum unenforceable under Massachusetts law); see also

Northeast Theatre Corp. 563 F. Supp. at 834 (D. Mass. 1983) (stating,

tively treated a forum selection clause as procedural for the limited
purposes of the factor analysis required under the forum non conveni-
ens doctrine articulated in Gulf Oil v. Gilbert, 330 U.S. 501 (1947).

See Royal Bed & Spring Co. v. Famossul Industria e Comercio de Moveis

Ltda., 906 F.2d 45, 49 (1st Cir. 1990). The complexities of the issue

have been well documented in several student notes. See, e.g., Robert

A. de By, Note, Forum Selection Clauses: Substantive or Procedural for

Erie Purposes, 89 Colum. L. Rev. 1068 (1989); Julia L. Erickson,

Forum Selection Clauses in Light of the Erie Doctrine and Federal

Common Law: Stewart Organization v. Ricoh Corporation, 72 Minn. L.

Rev. 1090 (1988).

16

in dictum, that contractual selection of California forum would be

unenforceable under Massachusetts law); compare Graphics Leasing Corp.

v. The Y Weekly, 1991 Mass. App. Div. 110 (1991) (holding forum

selection clause enforceable where parties sought to designate Massa-

chusetts forum); Diversified Mortg. Investors v. Viking Gen. Corp., 16

Mass. App. Ct. 142, 450 N.E.2d 176, 179 (1983) (suggesting enforce-

ability of forum clause designating Massachusetts forum). Recently,

however, the SJC has indicated (in dictum) a more receptive view

toward forum selection clauses, see W.R. Grace & Co. v. Hartford

Accident & Indem. Co., 407 Mass. 572, 582 n.13, 555 N.E.2d 214, 219

n.13 (1990) ("we see nothing inherently inappropriate in a forum

selection clause"), which appears to accord with the view adopted by

most other state courts, see Francis M. Dougherty, Annotation, Validi-

ty of Contractual Provision Limiting Place or Court in Which Action

May Be Brought, 31 A.L.R. 4th 404 (1992), and with the prevailing

federal court view that forum clauses foster policy interests impor-

tant to the parties and the courts. Zapata, 407 U.S. at 8; Stewart

Organization, 487 U.S. at 33 (Kennedy and O'Connor, JJ, concurring);

see Fireman's Fund Am. Ins. Cos. v. Puerto Rican Forwarding Co., 492

F.2d 1294, 1297 (1st Cir. 1974); Northeast Theatre Corp., 563 F. Supp.

at 834; see also Ernest & Norman Hart Bros., Inc. v. Town Contrac-

tors, Inc., 18 Mass. App. Ct. 60, 64, 463 N.E.2d 355, 358-59 (1984),

rev. den., 392 Mass. 1103, 465 N.E.2d 262 (1984) (surveying caselaw,

noting that "the general attitude of courts towards contractual forum

selection provisions obviously has changed in the direction of recog-

17

nizing them", and suggesting that Nashua River and Nute, see supra at

p. 16, no longer express viable policy in light of evolving federal

doctrine). The current status of Massachusetts law on this issue has

been termed "unclear," Geiger v. Keilani, 270 F. Supp. 761, 766 (E.D.

Mich. 1967), and the vitality of the Nute and Nashua River precedents

clouded. "Attorneys advising clients probably would be unwise to rely

on the persistence of the Nute principle in future Massachusetts cases

. . . . [although] counsel . . . even now cannot be certain . . . that

Massachusetts will follow [the] newer view [expressed in Zapata]. If

the Supreme Judicial Court should now decide to do so, it well may

adopt the modern view prospectively only and in very flexible form

. . .," Ernest & Norman Hart Bros., 18 Mass. App. Ct. at 64, 463

N.E.2d at 359; but see Scheck v. Burger King Corp., 756 F. Supp. 543,

546 (S.D. Fla. 1991) (assuming, without discussion, that Massachusetts

courts now would follow federal law, as enunciated by the First

Circuit, and uphold prima facie validity of forum selection clauses).

The viability of Nute and Nashua River is not determinative

in the present case, however, as we think the Massachusetts courts,

consistent with the contracting parties' intention, would apply

Washington law to determine the enforceability of the forum selection

clause.11 See Michael Gruson, Forum-Selection Clauses in Internation-

11This approach, which relies on the contracting parties' choice of
law as a basis for determining the enforceability of their forum
selection, has been criticized on the ground that "jurisdiction and
venue are concerns separate from choice of law, and . . . determining
the former usually precedes determination of the latter." See Linda

S. Mullenix, Another Choice of Forum, Another Choice of Law: Consensu-

18

al and Interstate Commercial Agreements, 1982 U. Ill. L. Rev. 133, 156

& n.228 [Forum Selection Clauses] ("most states determine the

enforceability of forum-selection clauses under the law governing the

contract"). The present contract provides that the interpretation of

the "terms and conditions of the order documents," including the forum

selection clause, must be governed by Washington law; and even though

Massachusetts law on the enforcement of forum clauses is unsettled,

its courts routinely enforce choice-of-law provisions unless the law

chosen violates established public policy or bears no reasonable

relationship to the contractual transaction between the parties. See

Mass. Gen. L. 1-105(1); Morris v. Watsco, Inc., 385 Mass. 672, 674-

75, 433 N.E.2d 886, 887 (1982); Comdisco Disaster Recovery Servs. v.

al Adjudicatory Procedure in Federal Court, 57 Fordham L. Rev. 291,

347 (1988); see also Instrumentation Assocs., 859 F.2d at 5 (holding

that "[lower] court erred by deciding the validity of the contract's
choice of law before considering the threshold question of whether the
parties' contractual choice of a Canadian forum was enforceable under
the conflict of laws principles embodied in Erie"). We do not agree.

It is well established that a forum selection clause does not
divest a court of jurisdiction or proper venue over a contractual

dispute. Rather, a court addressing the enforceability of a forum
selection clause is to consider whether it must, in its discretion,

decline jurisdiction and defer to the selected forum. See Zapata, 407

U.S. at 12; LFC Lessors, 739 F.2d at 6-7. Thus, the constitutional

concerns which prompt the rule that determination of jurisdictional
issues should "usually precede" determination of substantive law apply
only weakly, if at all, in forum selection cases following Zapata.

Moreover, following Norton v. Mathews, 427 U.S. 524, 528-33 (1976), we

repeatedly have held that complex jurisdictional issues may be by-
passed in circumstances where it is clear that the party challenging
jurisdiction will prevail on substantive grounds in any event. See,

e.g., Howard v. Rhode Island Hospital Trust, slip op. at 13 (December

2, 1992). Thus, we may bypass the Erie analysis, where state law

provides a straightforward substantive basis for resolving the present
controversy.

19

Money Management Systems, Inc., 789

F. Supp. 48, 52 (D. Mass. 1992). The Nute and Nashua River cases did

invoke public policy justifications for resisting forum selection

clauses, viz., the dangers of overreaching and the difficulties of

applying foreign law in a chosen forum. But even these earlier

decisions "place[d] no great reliance upon" these public policy con-

siderations, Nute, 72 Mass. (1 Gray) at 184, which have been undercut

in any event by more recent legal and historical developments.12 We

12The Nute court expressed the view that "the greatest inconvenience

[of contractual forum transfers] would be in requiring courts and
juries to apply different rules of law in different cases, in the
conduct of suits," 72 Mass. (1 Gray) at 184. It also noted that
"contracts [including forum clauses] might be induced by consider-
ations tending to bring the administration of justice into disrepute,
such as the greater or less intelligence and impartiality of judges,
the greater or less integrity and capacity of juries, [and] the
influence, more or less, arising from the personal, social or politi-
cal standing of parties in one or another [jurisdiction]." Id.

We think that modern caselaw developments, including the Massa-
chusetts courts' willingness to entertain motions to dismiss based on
the doctrine of forum non conveniens, see Universal Adjustment Corp.

v. Midland Bank, Ltd., 281 Mass. 303, 184 N.E. 152 (1933) (Rugg, J.),

to permit forum selection clauses in contracts principally involving
nonresidents, Mittenthal v. Moscagni, 183 Mass. 19, 23 (1903), and to

enforce forum selection clauses which vest jurisdiction in Massachu-
setts courts, see Graphics Leasing, 1991 Mass. App. Div. at 111,

suggest that Commonwealth courts have largely abandoned any policy
concern that the contracting parties' mutual selection of a non-
Massachusetts forum will impugn "the dignity or convenience of the
[Massachusetts] courts." Id. Furthermore, the Commonwealth courts'

more recent acceptance of contracting parties' choice-of-law provi-
sions, Morris, 385 Mass. at 674, and of "flexible" choice-of-law

rules, Bushkin Assoc. v. Raytheon Co., 393 Mass. 622, 473 N.E.2d 662

(1985), would appear to erode Nute's earlier endorsement of the view

that the application of "different rules of law in different cases"
would lead to "great[] inconvenience" for courts or juries.
Nashua River, decided after Nute, noted that the rule against

enforcement of forum selection clauses "related to a matter as to
which uniformity of decision and harmony of law among the several
jurisdictions of this country is desirable." 223 Mass. at 16. The

20

think the diminishing importance of the policies cited in these

earlier cases, their waning support in more recent Massachusetts

decisions, and the increasing role and vigor of federal doctrine,

would leave a Massachusetts court unconstrained by the same policy

considerations in applying the parties' chosen law to the choice-of-

forum determination in the present case. See Restatement (Second) of

Contracts 178(3) ("in weighing a public policy against enforcement

of a term, account is taken of (a) the strength of that policy as

manifested by legislation or judicial decisions . . . .") (emphasis

added). As we discern no significant public policy militating against

the application of Washington law in the present circumstances, and

Washington law obviously bore a reasonable relationship to the con-

tract between the parties, we think the Massachusetts courts would

enforce the parties' choice of Washington law.

SJC noted in Nashua River that virtually all state and federal courts

at that time refused to enforce forum selection clauses. Thus, a
fundamental policy consideration, which underlay the Nute and Nashua

River decisions, has undergone an about-face in recent years, as forum

selection clauses are now favored by the majority of state courts and

by the federal courts. See supra p. 17.

These historical changes may well explain why the only other
rationale for the Nute and Nashua River precedents the presumed

invalidity of contractual attempts to "oust appropriate courts of
their jurisdiction," Nashua River, 223 Mass. at 19 has been reject-

ed by the Supreme Court as "hardly more than a vestigial legal fic-
tion," predicated on "a provincial attitude regarding the fairness of
other tribunals." Zapata, 407 U.S. at 12. As noted, however, the SJC

is not bound by the view expressed in Zapata, and its adoption cannot

be presumed. See also Ernest & Norman Hart Bros., 18 Mass. App. at

64, 463 N.E.2d at 358-59 ("[i]f the Supreme Judicial Court should now
decide to [follow Zapata], it may well adopt the modern view prospec-

tively only and in very flexible form"); see also White-Spunner

Constr., Inc. v. Cliff, 588 So.2d 865, 866 (Ala. 1991) (reaffirming

invalidity of forum clauses under Alabama law).

21

22

C. Reasonableness of Washington Forum

Under federal law and Washington state law, the contracting

parties' forum selection is to be respected unless the challenging

party "clearly show[s] that enforcement would be unreasonable and

unjust, or that the clause was invalid for such reasons as fraud or

overreaching." Zapata, 407 U.S. at 15; see also Exum, 17 Wash. App.

at 478-79, 563 P.2d at 1315; cf. Mangham v. Gold Seal Chinchillas,

Inc., 69 Wash.2d 37, 45, 416 P.2d 680, 686 (1966) (intrastate agree-

ment); Bechtel Civil & Minerals, Inc. v. South Columbia Basin Irrig.

Dist., 51 Wash. App. 143, 146, 752 P.2d 395, 396 (1988) (same). Any

alleged overreaching must be based on something more than the mere

fact that the clause was a "boilerplate" provision printed on the back

of a form contract. See Donovan, 916 F.2d at 377. "It is not the law

that one must bargain for each and every written term of a contract,"

Lyall v. DeYoung, 42 Wash. App. 252, 256, 711 P.2d 356, 359 (1985);

"simply because the provision was part of what is called the 'boiler-

plate' section of the contract does not in itself make it unfair."

Reynolds Indus., Inc. v. Mobil Oil Corp., 618 F. Supp. 419, 423 (D.

Mass. 1985).

Lambert does not base the present claim on the ground that

the forum selection clause is a "boilerplate" provision. The princi-

pal contention is that the forum selection clause should be overturned

because it would be "seriously inconvenient" for Lambert. Lambert

cites Exum, 17 Wash. App. at 478-79, 563 P.2d at 1315, in which the

23

Washington Court of Appeals upheld a trial judge's discretionary

refusal to dismiss an action under a forum clause which required the

suit to be brought in New York. The Exum court noted that "all

contacts were made in Washington, partial performance was to be within

the state, all the plaintiff's witnesses reside within the State of

Washington, Defendant's Vice President who solicited Plaintiff resides

in [a state other than New York, and] it would be unjust, inequitable,

and unreasonable to require Plaintiff and all the witnesses to travel

to New York State to litigate the case." Id. See also Gold Seal

Chinchillas, 69 Wash.2d at 46-47, 416 P.2d at 686 (refusing to trans-

fer case to contractually selected out-of-state forum, on ground that

chosen forum was "totally unreasonable": all parties and witnesses

resided in Washington, contracts were made and to be performed entire-

ly in Washington, and the dispute was governed by Washington law).

We think Lambert misinterprets Exum. The "serious inconven-

ience" test applied in Exum was discussed in detail by the Supreme

Court in Zapata, which also cited the rule of Restatement (Second) of

Conflicts of Laws 80, see 407 U.S. at 11, and which has been cited

with approval by the Washington courts. See Bechtel Civil, 51 Wash.

App. at 146, 752 P.2d at 397 (citing Zapata); see also Supreme Court

Supports Enforcement, supra, at 530 (advocating Zapata's application

to state laws which are based on the Restatement (Second)); see

generally American Mobile Homes of Washington, Inc. v. Sea-First Nat'l

Bank, 115 Wash.2d 307, 313, 796 P.2d 1276, 1279 (1990) ("when a state

rule is similar to a parallel federal rule we sometimes look to

24

analysis of the federal rule for guidance"). Zapata held (as a matter

of federal law) that:

[W]here it can be said with reasonable assurance
that at the time they entered the contract, the
parties to a freely negotiated private interna-
tional commercial agreement contemplated the
claimed inconvenience, it is difficult to see why
any such claim of inconvenience should be heard to
render the forum clause unenforceable. We are not

here dealing with an agreement between two Ameri-

cans to resolve their essentially local disputes

in a remote alien forum. In such a case, the

serious inconvenience of the contractual forum to

one or both of the parties . . . might suggest

that the agreement was an adhesive one, or that

the parties did not have the particular contro-

versy in mind when they made their agreement; yet

even there the party claiming should bear a heavy

burden of proof.

407 U.S. at 16-17 (emphasis added).13 We think Exum and, more

importantly, Gold Seal Chinchillas, fall within the exception Zapata

articulated to forum selection clause enforceability: in each case,

the defendant sought transfer of an "essentially local dispute" to a

selected forum which was alien to all parties (so far as the record

shows), and largely unconnected with the contractual relations at

issue in the case. See Gold Seal Chinchillas, 69 Wash.2d at 46-47,

416 P.2d at 686; Exum, 17 Wash. App. at 479, 563 P.2d at 1316-16.

13Later federal cases, in this and other circuits, have sometimes
applied an even stricter standard, requiring sophisticated commercial
defendants to show that they would suffer such serious inconvenience
in litigation in the foreign forum that they would be effectively
deprived of their day in court. See Fireman's Fund, 492 F.2d at 1297;

see also, e.g., Pelleport Investors, 741 F.2d at 279; LFC Lessors,

Inc. v. Pearson, 585 F. Supp. 1362, 1365 (D. Mass. 1984).

25

The bases for the parties' selection of the Washington forum

in the present case are quite dissimilar. The Kysars reside and

operate their business in Washington. Their interest in selecting a

forum the consolidation of litigation involving far-flung opera-

tions was eminently reasonable. The contract in litigation has

strong links to Washington, where it was accepted and largely per-

formed. Moreover, Washington is no more "remote" from Lambert's place

of business than when he executed the order form, either on the

occasion of the present agreement or prior agreements between these

parties. The forum selection clause was printed clearly on the

reverse side of the form, in plain language, and the contract was not

so long as to make it difficult or impossible to read. See D'Antuono

v. CCH Computax Sys., Inc., 570 F. Supp. 708, 714 (D.R.I. 1983)

(Selya, J.) (interpreting buyer's signature in similar circumstances

as indicative of awareness of forum selection clause and its signifi-

cance); Lyall v. DeYoung, 42 Wash. App. 252, 256, 711 P.2d 356, 358-59

(1985), rev. den., 105 Wash.2d 1009 (1986) ("[i]n the absence of fraud

the signator is deemed to have had ample opportunity to study the

contract and its provisions including recitations which are properly

referenced on the back side of the instrument"); H.D. Fowler Co. v.

Warren, 17 Wash. App. 178, 180-81, 562 P.2d 646 (1977) (enforcing

attorney fee provision on back of contract despite signatory's claimed

ignorance of its presence). There is no indication that Lambert's

assent resulted from "overreaching or the unfair use of equal bargain-

ing power": Lambert is an experienced merchant who had purchased

26

Christmas trees from the Kysars since 1987 and whose family had sold

Christmas trees in Boston since 1953, see Lambert Affidavit at 3.

There is nothing to suggest that he was coerced by the Kysars, or that

the agreement was anything but an arms-length transaction between

parties of roughly equivalent bargaining power. Under these circum-

stances, the contracting parties are bound to the forum selected in

their contract.

D. Application of Forum Selection Clause

Lambert asserts, finally, that even if the district court

properly dismissed the contract claims under Rule 12(b)(6), the

contract-related tort claims were not directly covered by the forum

selection clause, and issues of material fact remain in genuine

dispute, precluding their summary dismissal under Rule 12(b)(6).

Lambert argues, in effect, that he should be permitted to escape the

consequences of the parties' forum selection merely by alleging

tortious conduct relating to the formation (rather than the perfor-

mance) of their contract. We cannot accept the invitation to reward

attempts to evade enforcement of forum selection agreements through

"artful pleading of [tort] claims" in the context of a contract

dispute. Pascalides v. Irwin Yacht Sale North, Inc., 118 F.R.D. 298,

301 (D.R.I. 1988) (quoting Coastal Steel, 709 F.2d at 197); D'Antuono,

570 F. Supp. at 715. Although the Zapata Court did indicate that a

forum selection clause should not be given effect if it was the

product of fraud, see 407 U.S. at 12, the Supreme Court subsequently

27

interpreted this exception, in Scherk v. Alberto-Culver Co., 417 U.S.

506 (1974), to exclude the sorts of claims raised by Lambert. The

Court in Scherk stated that

[the Zapata fraud exception] does not mean that

any time a dispute arising out of a transaction is
based upon an allegation of fraud . . . the clause
is unenforceable. Rather, it means that [a] . . .
forum-selection clause in a contract is not en-
forceable if the inclusion of that clause in the

contract was the product of fraud or coercion.

Id. at 519 n.14 (emphasis in original); see also Gruson, Forum-Selec-

tion Clauses, 1982 U. Ill. L. Rev. at 165 ("a party should not be

permitted to escape a forum-selection provision by merely calling the

validity of the entire contract into question").

The better general rule, we think, is that contract-related

tort claims involving the same operative facts as a parallel claim for

breach of contract should be heard in the forum selected by the

contracting parties. Compare General Environmental Science Corp. v.

Horsfall, 753 F. Supp. 664, 668 (N.D. Ohio 1990) (refusing transfer of

contract-related tort claims where plaintiff asserted no breach of

contract, and cause of action did not directly concern formation or

enforcement of contract containing forum selection clause).

III

CONCLUSION

As the forum selection clause is valid, exclusive and

28

enforceable, the present action was properly dismissed.

Affirmed.

29